Patricia CARTER

v.

SHOP RITE FOODS, INC.

Civ. A. No. CA–3–74–0620–G.

United States District Court,
N. D. Texas,
Dallas Division.

May 17, 1979.

John A. Martin, Carrington, Coleman, Sloman, Johnson & Blumenthal, Dallas, Tex., for special master.

Linda N. Coffee, Palmer, Palmer & Coffee, Dallas, Tex., Sue B. Goolsby, Dallas, Tex., for plaintiff, Patricia Carter.

Durwood D. Crawford and Deborah A. McCann, Seay, Gwinn, Crawford, Mebus & Blakeney, Dallas, Tex., for defendant, Shop Rite Foods, Inc.

## MEMORANDUM OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

Plaintiff, a female former employee of Shop Rite Foods, Inc., filed this class action in July, 1974, alleging the company discriminated against women in promotions. The certified class included "those female persons who are presently employed or have been employed since June 6, 1973, at one or more of the Defendant's 'Piggly Wiggly' Supermarkets that comprise the Dallas District." This court, after the November, 1976 trial on liability, found that the defendant engaged in a class-wide pattern of discrimination against its female employees. After notice to the class, 24 members filed Proof of Claim forms, seeking individual back pay awards.[1] On November 20, 1978, the trial on remedy began.

Before the appropriate awards for the individual claimants may be determined, the court must resolve certain complex issues of law and fact. First, taking into consideration the peculiar nature of defendant's promotional system, the court must determine the burden the claimants must meet to establish a prima facie case, and the standard defendant must satisfy to overcome each claimant's showing. Second, the court must select the appropriate formula for reconstructing the positions the claimants would have held absent discrimination. Finally, the question of the appropriate date(s) for the termination of back pay must be answered. This opinion will

---

1. Mildred Frazier withdrew her claim shortly before trial. Two of the remaining 23 claims, those of Karen Williams and Joanne Spencer, have been severed and entitlement to back pay found. This opinion addresses the remaining 21 claims.

resolve these issues, will determine which claimants are entitled to back pay, and will appoint a Special Master to perform the actual back pay calculations in Phase III of this proceeding.

### Burden of Proof

■ It is well established that after liability has been found in a Title VII proceeding, a presumption arises that the class members are entitled to back pay. *Pettway v. American Cast Iron Pipe Company,* 494 F.2d 211, 259, (5 Cir. 1974). In order to avail herself of this presumption, however, each claimant must establish a prima facie case of individual discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The Supreme Court in *Teamsters* emphasized that the nature of this showing is not inflexible. "The facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from [a claimant] is not necessarily applicable in every respect to differing factual situations." *Id.* at 358, 97 S.Ct. at 1866, *quoting McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ A court in determining the appropriate standard must not require a quantum of proof so rigid as to defeat the purposes of the Act. The objectives of Title VII are to achieve equal employment opportunities and to remove those barriers by which employers favor white male employees over other employees. *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Persons who have suffered discrimination are to be made whole. To effect these purposes, Congress has vested in district courts broad equitable powers to fashion decrees which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

The Supreme Court in *Teamsters* held that the purposes of the Act are best fulfilled by requiring a claimant to demonstrate either that he applied unsuccessfully for a position or that, even though he did not apply, "he was a potential victim of unlawful discrimination." 431 U.S. at 367, 97 S.Ct. at 1871. Justice Stewart, writing for the majority, required claimants who failed to apply to meet "the not always easy burden" of proving that, had it not been for the discriminatory practices, they would have applied for the job.

In applying this standard to the facts before it, the court is mindful of the significant factual distinction between *Teamsters* and this case. In *Teamsters* there existed application procedures which were available to any class member, and everyone who was hired submitted an application. Shop Rite, however, had no established procedure whereby an employee could make a formal application for promotion. The female employees were not notified of the existence of vacancies and thus had no opportunity to request promotion to a particular position. The male employees who received promotions were sought out by the management and did not have to apply. The lack of a formal application procedure was thus itself a tool of discrimination. Absent discrimination, the claimants would have been afforded a means of applying for a management position.

■ To satisfy the *Teamsters'* standard under the facts of this case, each claimant must show that she wanted to be promoted and would have accepted a promotion if offered. This question is a factual one for the trial court's determination. *Id.* at 371, n. 58, 97 S.Ct. at 1873 n. 58. While evidence of an employee's informal inquiry or expression of interest goes far toward establishing a claimant's prima facie case, "[an] unexpressed desire credible and convincing" may suffice. *Id.* at 369, n. 53, 97 S.Ct. at 1873. *Teamsters* requires that the employee also come forward with basic information about her qualifications. *Id.*

■ After a claimant has made this threshold showing, the burden shifts to the defendant to show that the employee was denied a promotion for lawful reasons. *Id.*

at 362, 97 S.Ct. 1843. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 773, n. 32, 96 S.Ct. 1251, 47 L.Ed.2d 444. The burden that Shop Rite logically must overcome is not that a particular claimant should not have been promoted. Rather, the defendant must prove that given the actual criteria according to which a decision to promote was made and absent sex discrimination, a claimant would in fact not have been promoted. The defendant must prove its case with clear and convincing evidence. *Pettway v. American Cast Iron Pipe Co., supra,* at 259; *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364 (5th Cir. 1974).

*Reconstruction of Work History*

■ There is no way of determining with precision which jobs the claimants in any given class would have held absent discrimination. Thus, the method by which a court reconstructs claimants' work history and awards back pay should not be rigid. *Pettway v. American Cast Iron Pipe Co., supra,* at 260. Courts have recognized that while the mechanics of reconstructing work history are difficult and the results imprecise, "whatever difficulty of ascertainment exists [is] due to the discriminatory wage structure maintained by the defendant . . [I]t suffices for the trial court to determine the amount of back wages 'as a matter of just and reasonable inference'. . . . Difficulty of ascertainment is no longer confused with right of recovery." *Id.* at 260, *quoting Brennan v. City Stores, Inc.,* 479 F.2d 235, 242 (5th Cir. 1973).

The Fifth Circuit has evolved two principles to guide trial courts in reconstructing work history. First, unrealistic exactitude is not required, and second, uncertainties should be resolved against the discriminating employer. *Id.* at 260–61.

■ Shop Rite first contends that regardless of the formula the court uses to reconstruct work histories, this hypothetical reconstruction period cannot begin until back pay liability commences. It thus argues that in determining what position the employees would have been in absent discrimination, the court may not consider any

discrimination that occurred before the cutoff date for awarding back pay. Under 42 U.S.C. § 2000e–5(g), back pay liability begins no earlier than two years before the plaintiff files his EEOC charge. Neither the caselaw nor the purposes of the Act support Shop Rite's position. *Miller v. Miami Prefabricators, Inc.,* 438 F.Supp. 176 (S.D.Fla.1977), held that although the plaintiff filed charges in 1973, the court could consider his employment history and the available vacancies beginning in 1965 for purposes of determining back pay relief. *Id.* at 178, 181–82. The court reasoned that Congress added § 2000e–5(g) in 1972 solely to limit the amount that a plaintiff could recover from employers who would otherwise be liable for back pay beginning in 1965. The court instructed that this two year cutoff should only be applied after each employee's "rightful place" has been determined. *Id.* The section thus in no way limited the time period for reconstructing work history.

Language in *Albermarle Paper Co. v. Moody, supra,* supports the district court's view in *Miller.* Implying that violations occurring before the two-year back pay period should be considered, the Supreme Court stated, "Under Title VII backpay liability exists only for practices occurring after the effective date of the Act, July 2, 1965, and accrues only from a date two years prior to the filing of a charge with the EEOC." 422 U.S. at 410, n. 3, 95 S.Ct. at 2368.

A hypothetical reconstruction period commencing with the passage of the Act furthers a primary purpose of Title VII—to "make whole" the victims of discrimination. *See Pettway v. American Cast Iron Pipe Co., supra,* 494 F.2d at 252. Further, the Act should be enforced in such a way that it deters discrimination. *See Albermarle Paper Co. v. Moody, supra.* A two year back pay period would have only a slight deterrent effect if the reconstruction period also commenced two years before the filing of an EEOC charge.

Shop Rite next contends that a work history reconstruction must place each claimant in a specific vacancy and that each claimant must point to such a vacancy for which she was qualified and which she was denied because of her sex. The defendant further proposes that a claimant should only be projected into those vacancies in the store in which she worked, and only into the positions that were filled by male employees having less seniority and no previous management experience.

Defendant's suggested reconstructions, because of the rapid movement into and within the management structure, are not suited to the facts of this case. The turnover of those in management positions was substantial. During 1969 and 1970, there were 49 vacancies in the position of store manager, 38 of which were filled by persons who were not transferring laterally from a store manager position in another store. From June 6, 1971 until June 6, 1975, there were 82 vacancies in the position of store manager, at least 52 of which were filled by new persons who were not already store managers. In the position of assistant manager, from June 6, 1971 until June 6, 1975, there were 108 vacancies, at least 73 of which were filled by new persons. From June 6, 1971 until June 6, 1975, there were 67 vacancies in the position of produce manager, 42 of which were filled by new persons. In the positions of district manager and district supervisor, there were 13 vacancies from September 2, 1970 until June, 1975. An analysis of defendant's exhibits reveals no practice of confining a promotee to the store in which he had been working. When a stocker became an assistant manager, he was as likely to be transferred to another store as to be promoted within his present store. The same random movement characterized promotions from assistant manager to manager. Additionally, assistant managers and managers were frequently transferred laterally.

In light of these facts, the realistic method of reconstruction is not one in which a claimant is placed in a particular opening at a certain store. Such a model would define the determinants so narrowly as to injure certain claimants. As the Fifth Circuit pointed out in *Pettway,* to presume that claimant # 1 would actually be promoted to position X rather than claimant # 2 is overly speculative and unfairly penalizes claimant # 2. 494 F.2d at 262, n. 152. The better method is the one approved by the Fifth Circuit in *Pettway, supra,* and by the Seventh Circuit in *Bowe v. Colgate-Palmolive Co.,* 489 F.2d 896 (7th Cir. 1973)—a formula of "comparability." "Approximations are based on a group of employees, not injured by the discrimination, comparable in size, ability, and length of employment . . . to the class of plaintiffs." *Pettway v. American Cast Iron Pipe Co., supra,* 494 F.2d at 262. The court, in applying this general formula to the facts of this case, must select a group of Shop Rite employees sufficiently similar to the class so that, absent discrimination, the claimants would reasonably have progressed as the model group did.

In this case, the claimants were all food clerks, a term used to describe both checkers and stockers. Somewhere between 42% and 50% of all food clerks were women.[2] It was almost exclusively from this pool of food clerks that Shop Rite selected its managers. It is reasonable to presume, therefore, that absent discrimination, these women would have progressed as the male food clerks did. Therefore, anywhere from 42% to 50% of the people in management and supervisory positions would have been female. As of June 6, 1971, the date on which Shop Rite's liability for back pay

---

**2.** During Phase I, plaintiff introduced a seniority list reflecting that in February, 1975, 42% of the food clerks were female. Finding of Fact # 23, Memorandum Opinion & Order, May 2, 1977. Cliff Fielding, formerly an official of the Retail Clerk's Union, testified during Phase II that about 50% of the bargaining unit was female. Defendant introduced a seniority list indicating that in 1973 as few as 38.4% of the food clerks were women. This court in Phase I found that in 1973, however, defendant limited its hiring of women. Finding of Fact # 40, Memorandum Opinion & Order, May 2, 1977. The court will thus presume that at all times pertinent to this litigation between 42% and 50% of the food clerks were women.

commences,[3] Shop Rite operated 23 stores in the Dallas District. Absent discrimination, on June 6, 1971, one would expect that there would have been 10 or 12 female store managers, 10 or 12 female assistant managers, and 10 or 12 female produce managers. Of the 21 claimants whose claims remain, 11 state that they were deprived of the position of manager; four, assistant manager; four, produce manager.[4] There is no reason statistically why these women could not have been promoted.

■ In reconstructing work histories, the court must also devise a standard for determining when each female would have been promoted. It thus must resolve whether each claimant's reconstructed work history should reflect an assumption that when she was hired she immediately would have entered management, or whether it should presume that she would have functioned as a food clerk for a certain period of time. In some cases, the courts have awarded back pay accruing from the date of a claimant's employment or from the passage of the Act in 1965, whichever is later. *Bowe v. Colgate-Palmolive Co., supra,* 489 F.2d at 903; *Stamps v. Detroit Edison Co.,* 365 F.Supp. 87 (E.D.Mich.1973); *United States v. Wood, Wire & Metal Lathers International Union, Local 46,* 328 F.Supp. 429 (S.D.N.Y.1971). On their face, such awards appear to grant a windfall to the class, because they do not take into account the fact that the claimants might not have achieved the higher paying positions immediately upon employment. The court in *Stamps* avoided this problem by averaging the pay rates of the skilled trade positions from which claimants were excluded and subtracting from that amount the claimant's actual salary. This formula has the effect of taking into account the role of seniority. Similarly in *Bowe,* the court approved the use of a test period occurring after discrimination had

ended to determine the level of job each female would have performed absent discrimination.

An examination of the defendant's exhibits reveals that, in this case, an across-the-board award of back pay based on the managerial salary level to which each claimant asserts she was entitled, accruing from June 6, 1971 or the date of the claimant's employment, whichever is later, would give the claimants too great a windfall. Males were rarely hired directly into management. Rather, they generally were promoted from the ranks of food clerks after a period of time elapsed.

To determine the position each claimant would have held absent discrimination, the Special Master will be guided by the median length of a male's tenure at the time of promotion. The court recognizes the weakness of this measurement. Even a cursory comparison of various males' work history reveals that tenure alone did not determine promotion. While one man became a manager after one month as assistant manager, another waited 64 months for his promotion. Other factors undoubtedly contributed to the promotional decision including, but not limited to, previous experience, performance, and personality. Because no evidence introduced at trial revealed any ascertainable standard for promotion, however, the court finds it impossible to gauge the significance of these variables. The use of the males' median tenure to reconstruct work history has a number of advantages. First, unlike an average, the median is not skewed by the existence of a very high or very low figure. Furthermore, a median tenure period necessarily incorporates the effects of the otherwise elusive variables such as work quality or experience. Finally, it is workable.

---

**3.** This date is two years before plaintiff filed her EEOC complaint. *See* U.S.C. § 2000e-5(g).

**4.** *Manager:* Patricia Carter, Joyce DeBord, Betty Spafford, Joane Inglet, Ruth Stelck, Mary Dunafan, Ruby Decker, Grace Massey, Eva Yarbrough, Catherine Pugh, and Ruth Brammer.

*Assistant Manager:* Maudie Simpson, Lois Smith, Carolyn Lamb, and Rosemary McDowell.
*Produce Manager:* Mildred Marie Brown, Mildred Hayes, Waldine Kent, and Janice Brooks. *Meat Cutter:* Marie Stricklen and Cynthia Burks.

In applying the comparability formula to each individual claimant, the Special Master will use the following method of analysis. First, he will determine the median tenure of male food clerks before promotion to produce manager and assistant manager, of assistant managers before promotion to manager, and of managers before advancement to supervisor. Then, applying these median figures to each claimant, he will determine the rank that a particular claimant presumptively would have achieved absent discrimination as of June 6, 1971, the date on which Shop Rite's liability for back pay commences. He will then decide whether the claimant would have progressed beyond this point after June 6, 1971. Unless a particular claimant has failed to make a prima facie showing or Shop Rite has been able to overcome this showing, the claimant will be entitled to recover as back pay the difference between what she would have earned after July 6, 1971 and what she actually did earn.

Because of the erratic employment history of many males at Shop Rite, calculation of the median tenure figures may at times be complex. No time should be included in the calculations in which the employee was not actually employed by Shop Rite. Breaks in employment or military leave should not be counted. In instances in which a particular assistant manager was demoted to stocker before being promoted again to assistant manager then to manager, only that time between repromotion to assistant manager and promotion to store manager should be included. The Master also should not include in his calculations any period of previous employment with Shop Rite during which time the employee was not promoted. Thus, if a male was a Stocker for eight months, quit for six, then was rehired and worked as a Stocker for four more months before promotion to Assistant Manager, the Master should calculate his tenure as four months. Comparably, if a claimant worked a year, quit, was rehired, and worked three more years, the Master should reconstruct her work history from her rehire date.

The application of the comparability formula to those five claimants who contend that they should have achieved the level of supervisor (Patricia Carter, Betty Spafford, Catherine Pugh, Ruth Stelck, and Joyce DeBord) may be more difficult than the other reconstructions. Although the court does not have evidence before it at this time on the precise number of supervisory positions in the Dallas District, the evidence that the parties present to the Special Master may establish that fewer supervisory positions were available for women than there are claimants for those positions.[5] Should this develop, the Master should devise a formula which awards back pay on a pro rata basis and which takes into consideration any changes in the number of supervisors that may have occurred.

Defendant contends that because many women would not have accepted a promotion due to the loss of union protection, the use of such a comparative projection as this court here adopts is necessarily inaccurate. Defendants overlook the fact that in order to become managers, a large number of men were willing to forego their union privileges. This court is unwilling to indulge in the presumption that women, unlike men, would have been unwilling to give up their union membership. Such stereotyping is precisely the sort of evil which Title VII seeks to eradicate.

### Termination of Back Pay Liability

In June, 1975, Shop Rite sold 17 of its Dallas stores to "independent operators." Shop Rite contends that the effect of these sales was to terminate its back pay liability. If these sales were made for an illegal purpose, then Shop Rite's liability did not cease. The evidence establishes, however, that Shop Rite did not sell these stores for an illegal purpose, but rather sold them for legitimate business reasons.

Plaintiff argues that Shop Rite retained such control over the stores that they were

5. The Master, in calculating the number of available positions, should assume that, absent discrimination, 42–50% of the supervisors would have been women.

a single entity with Shop Rite and thus the defendant's liability continued after the sales. To determine whether separate entities actually constitute a single employer within the meaning of Title VII, one circuit court has adopted a four-pronged test: 1) interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership or financial control. *Baker v. Stuart Broadcasting Co.,* 560 F.2d 389 (8th Cir. 1977). This test, originally promulgated by the NLRB, *see, e. g., Radio & Television Broadcast Technicians, Local Union 1264 AFL–CIO v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965); *Royal Typewriter Co. v. National Labor Relations Board,* 533 F.2d 1030 (8th Cir. 1976), is well-suited to Title VII cases. It permits the courts to read the term "employer" in the manner best calculated to achieve the purposes of the Act.

An examination of Shop Rite's relationship with its independent operators reveals that although it maintained a tight rein on these owners, it did not control them so completely as to be an employer. Most of the "purchasers" of the Dallas stores were former Shop Rite store managers who entered into substantially identical agreements with Shop Rite. Shop Rite subleased the premises to the purchasers and sold them the equipment, fixtures, and merchandise inventory upon their three-year 9% notes, retaining a security interest in the assets sold. The promissory notes were payable over 156 weeks with a final substantial ("bumper") payment due on the final week. In return for a monthly service fee, Shop Rite agreed to provide certain accounting and bookkeeping services, including maintenance of payroll records and personnel files at its main office in Grand Prairie. Shop Rite also set inventory levels for the stores sold. The purchasers were required to deposit the store revenues into an account which Shop Rite controlled. Shop Rite in turn transferred the funds deposited into another account from which it paid all operating expenses. The purchasers were guaranteed a weekly draw which was to be paid from store revenues.

If the revenues were inadequate, Shop Rite would advance the money and increase the amount of secured indebtedness.

None of the independent owners invested any money in the acquisition of the stores. Shop Rite required no down payments, requested no personal financial statements, and conducted no credit checks of any of the purchasers. In each instance, however, the recited sales price was substantial—often in excess of $200,000. One of the purchasers, Frank Block, testified that at the time that he purchased store # 387 for over $200,000, he had no source of income other than his store manager salary—$375 a week. Shop Rite was fully aware that the purchasers lacked the personal resources from which to pay the promissory notes.

After the sale, almost all of the stores continued to lose money. During 1976 and 1977, Shop Rite repossessed 14 of the stores. None of the three remaining owners made the bumper payment to Shop Rite. The defendant renegotiated the repayment terms with each shortly before the final payment was due under the original contract.

In repossessing the stores from the independent owners, Shop Rite never instituted formal foreclosure proceedings. Instead, Shop Rite and each independent owner executed a legal instrument whereby the assets were returned to Shop Rite in exchange for the owner's release from his personal liability to Shop Rite. Frank Block testified that he was notified of Shop Rite's decision to take back his store by a telephone call one week before the actual repossession.

In view of the continuing losses incurred by the independently owned stores, Shop Rite was from the outset of the sales in a position to foreclose at will and pursue deficiency judgments against the owners. Shop Rite used the threat of foreclosure to exercise considerable actual control over the operations of the stores sold to the independent owners. As an example, the defendant on occasion used its financial leverage to dictate the prices which the independent owners could charge in their stores. After the sale, Shop Rite continued to send its price book to the independently-owned

stores. Shop Rite monitored the prices in the independently-owned stores through periodic price checks. On one occasion, after a price checker revealed that too many prices were "off the book," Shop Rite immediately repossessed store # 428.

The real authority that the independent owners possessed was in the realm of personnel. Shop Rite did not control their employment practices or their labor relations. They could hire, promote, and fire their store employees as they saw fit.

These facts indicate that the independent owner arrangements satisfy three of the four elements necessary for the court to find that Shop Rite was in fact the employer. The operations were interrelated. Management at the supervisory level was the same. Given the financial leverage that Shop Rite exercised, Shop Rite and the "independent stores" were in fact commonly owned and controlled. The fourth and crucial test, however, is not met. Although Shop Rite did have control over the independent owners, the control did not extend into one area—the area of personnel—which is indispensable to the imposition of liability on Shop Rite. Therefore, during any time interval that store employees worked for an independent owner, Shop Rite is not liable to them for back pay. Because plaintiff does not seek back pay after June 6, 1977, liability to employees of any store that was either not sold or that was repossessed terminates on that date.[6] The Dallas District continued to have supervisors after the sale of the stores. Therefore, the cutoff date for those persons entitled to receive back pay as supervisors ends June 6, 1977 and not on the dates that the stores were sold.

*Determination of Claims*

*Patricia Carter.*

█ Plaintiff clearly established her prima facie case. She was employed by Shop Rite from September 1, 1967 until July 21, 1976. Carter worked in all defendant's stores in the Dallas District, holding positions as checker, office girl, and non-foods clerk. Before her employment with Shop Rite, she worked for approximately one year as a checker for Worth Food Mart, later acquired by Shop Rite. At trial she claimed that because of her sex she was denied positions of supervisor, store manager, assistant store manager, and meatcutter. She was not offered any of these positions.[7] Beginning in 1968, plaintiff repeatedly asked her store managers and district level supervisors to be promoted into management or meatcutter positions.

Defendant's attempts to overcome plaintiff's prima facie case are not persuasive. Shop Rite introduced evidence that plaintiff worked part-time in an undercover capacity for a security firm retained by Shop Rite and contends that she could not have worked for management while performing her undercover duties. Plaintiff testified that if necessary, she would have given up the security job for a management position. One witness testified plaintiff did not have the physical ability to perform the tasks required of a manager or assistant manager. When plaintiff was employed in non-foods, however, she frequently lifted crates weighing 90 pounds. Since the trial, defendant has conceded that Carter was "possibly qualified."

Carter is entitled to receive back pay. In Phase III of this trial, the comparability formula will be applied to determine the precise position she would have attained and the amount of back pay due her.

*Betty Spafford.*

█ Claimant Betty Spafford was first employed by Shop Rite from March, 1965

---

**6.** For example, if a store was sold May 1, 1976, then repossessed January 1, 1977, Shop Rite would be liable until May 1, 1976, then again from January 1 to June 6, 1977. It would not be liable for back pay during those months that the store was independently owned.

**7.** The court found in Phase I of these proceedings that an offer of assistant manager made to plaintiff in December, 1975, was not bona fide. Finding of Fact # 47, Memorandum Opinion & Order, May 2, 1977.

until March, 1966, then was rehired in November, 1966 and worked until July, 1976. She had had eight years of experience as a checker at another grocery chain. During her tenure at Shop Rite, she worked in all the Dallas stores in the positions as full-time checker, office girl, and price checker. She also received training at Shop Rite's Grand Prairie office in various company departments. From May, 1975 until May, 1976, she performed the duties of assistant manager of store # 334, but was paid as a checker.

Although she testified that she wanted to become an assistant store manager, store manager, or supervisor, Spafford was never promoted or offered a promotion. Spafford also testified that she would have accepted a managerial position at any of the Dallas stores.

In 1971, Spafford first began asking her superiors for a promotion. During the remainder of her employment, she made her request to three different managers and one supervisor.

While it is true that Spafford developed health problems, her health was not sufficiently bad to interfere with her advancement until late 1977, after she left Shop Rite. Had Spafford not been a victim of discrimination, she would have progressed in a manner comparable to her male counterparts. She is entitled to receive back pay.

Shop Rite argues that Spafford's Proof of Claim form was not timely filed and thus that she may not recover back pay. Spafford sent her completed proof of claim form to the attorney for the class in a timely fashion. Because the attorney's offices moved, however, the class attorney did not receive the claim. Upon discovering this fact, Spafford immediately filed a second form which was received. Because Spafford tried in good faith to submit her claim, it is not barred.

*Joyce DeBord.*

Claimant Joyce DeBord was employed by Shop Rite from February 16, 1970 until July 12, 1977. Before working for Shop Rite,

she worked for six months as a checker for another grocery company. During most of her employment, she worked as full-time checker, office girl, and briefly, as non-foods clerk. For a few months in 1977, she was Clerk-in-Charge of store # 455. DeBord asked to be promoted to a managerial position on several occasions. In 1976, one of the independent owners offered her the position of assistant manager, for a $2.00 per week pay raise. Because she did not believe the offer was made in good faith, she turned it down. When the owner later raised the salary, she accepted the position. She believes that she was denied jobs as assistant manager, manager, or supervisor because of her sex.

Defendant did not present evidence sufficient to overcome DeBord's prima facie case. She is entitled to receive back pay.

*Joane Inglet.*

Claimant Joane Inglet worked for Shop Rite from September, 1965 until October 13, 1977. During that time she served as checker and office girl. She began work in the Fort Worth Division in store # 325, then transferred to store # 340 in 1967. Store # 340 in Grand Prairie became part of the Dallas District some time before 1974.

Claimant has established a prima facie case. She testified that she functioned as the manager of the store. She often showed the manager and assistant manager proper procedures, had complete responsibility for the office, and often was responsible for all store employees when the manager would leave. Inglet was never offered any management positions. At one point when a produce manager position became vacant, she requested the job. She performed duties as produce manager for three weeks before a male replacement was transferred from another store. She discussed her desire to be promoted to a managerial position with several managers. When she found her inquiries had become the subject of her superiors' jokes, she testified that she made no further attempt to

obtain a promotion because she believed her efforts would be futile. Inglet further testified that she would have accepted a position as manager, assistant manager, or produce manager at any Dallas store.

Defendant contends that Inglet did not specify in her Proof of Claim form that she was deprived of the position of Manager. The form read as a whole, however, gives fair notice of her claim to a manager position.

Because the median tenure calculations for males will include the time they were employed by Shop Rite in another district, the reconstruction of Inglet's work history should begin September, 1965. She is not entitled to receive back pay until the date the Grand Prairie store became part of the Dallas District however.

*Ruth Stelck.*

Claimant Ruth Stelck was first employed by Shop Rite (or its predecessor) from December 17, 1962 until March 18, 1967. Stelck was rehired by Shop Rite on September 20, 1969 at store # 344 where she worked until that store closed on August 3, 1977. During her entire employment at Shop Rite, Stelck worked as a full-time checker. She was never promoted or offered promotion into any management positions. Stelck testified that because of her sex she was denied the positions of supervisor, store manager, assistant manager, and produce manager. At one point, Stelck discussed her interest in being promoted with Lonnie Haynes, one of her store managers. She testified that because she felt it was fruitless effort and because she did not know of any formal application procedure, she did not pursue the matter any further. Stelck further testified that she would have accepted any of the management positions at any of the defendant's stores in the Dallas District.

Stelck's employment record with Shop Rite was good. Bob Smith, one of Stelck's managers at store # 344, and a former Dallas District Manager, testified that in his opinion, Stelck could have handled the job of store manager.

Defendant contends that Stelck would not have been willing to accept the additional responsibility and longer hours required of a manager. In support of its contention, defendant cites Stelck's one time refusal of the office girl position. Stelck testified that she turned down the job only because she was afraid that as the office girl she might be blamed for the stealing which she testified often occurred in that store located in a high crime neighborhood. This testimony does not constitute clear and convincing evidence that the claimant would not have accepted a job in management, particularly in light of the facts that promotees were often transferred to different stores, that she testified that she would have accepted such a promotion and that she told her manager that she was interested in a management job. Stelck also testified that she would have been willing to work the longer hours required of the management positions. Defendant's rebuttal evidence consisted solely of Smith's conjecture that Stelck would not have been willing to work longer hours. Smith admitted that his belief was based only upon the fact that Stelck never asked for more hours as a checker. Such speculation does not constitute clear and convincing evidence.

In light of her good employment record, the court finds that she would have progressed as her male counterparts did. Her work history reconstruction should begin on September 20, 1969.

*Ruby Decker.*

Claimant Ruby Decker was first employed by Shop Rite (or one of its predecessor companies) in August, 1964 and worked continuously until June 2, 1975. Before working with Shop Rite and its predecessor company, Decker and her husband ran a small grocery store for several years. During her tenure with Shop Rite (except for a brief period when she worked in non-foods) she worked as a full-time checker and office girl.

She testified that she wanted to be promoted to the positions of store manager,

assistant store manager, and produce manager, but was denied these positions because of her sex. Decker further testified that she would have accepted any of the management positions at any of defendant's Dallas stores. She was never promoted or offered a promotion into management. Although Decker asked several of her store managers if she could be the assistant manager, the responses to her inquiries were always negative. One store manager, Cliff Taylor, told Decker and claimant Mary Dunafan that women were too stupid to be managers. Another store manager, Jack Gates, told her that "in Piggly Wiggly rules there could be no women managers or assistant managers."

Defendant does not contest the fact that Decker was a good employee. Defendant's primary defense to Decker's claim is based upon her alleged health problems involving nervous tension and back problems. Defendant also contends that Decker's desire to remain in Garland would have prevented her from accepting promotions. The evidence indicates, however, that Decker's problems with nervous tension caused by high blood pressure were minor and caused her to miss only a minimal amount of work. Similarly, Decker's problems with muscle spasms did not prevent her from carrying out groceries as a checker or working as a non-foods clerk, a position which required substantial lifting. Furthermore, at least one store manager, S. C. Sherrard, had back problems serious enough to require surgery. Sherrard nevertheless continued to manage his store. Finally, in light of her testimony that she would have accepted a managerial position anywhere in Dallas, the fact that Decker may have preferred to work near her home as a checker is insufficient to establish that she would not have taken a managerial post elsewhere. She is entitled to receive back pay.

*Mary Dunafan.*

██ Claimant Mary Dunafan was employed by Shop Rite from September 19, 1966 until June 4, 1977. Before her employment with Shop Rite, Dunafan worked for a number of years for several banks in the Dallas area. During her employment with Shop Rite, Dunafan worked as a checker and office girl. Dunafan testified that she wanted to be promoted to the positions of store manager, assistant store manager, and produce manager but was denied these positions because of her sex. She further testified that she would have accepted any of the management positions in any of the defendant's Dallas stores. As early as 1969, Dunafan asked a number of her store managers and other superiors to be promoted into management. She testified that her superiors' responses ranged from overt hostility to open amusement.

Defendant's primary contest of Dunafan's claim is based upon her health. Although Dunafan testified concerning several health problems which she had during her employment with Shop Rite, the evidence does not indicate that they caused her to miss any work prior to March, 1974. Defendant's records indicate that Dunafan was on medical leave from March 9, 1974 until April 15, 1974. Thereafter, she did not go on medical leave again until April 9, 1977, shortly before her store closed. Dunafan testified that after she developed back problems she was able to continue mopping floors, carrying out groceries, and unloading trucks as she had before. Furthermore, the evidence established that several store managers had serious health problems and yet were able to continue in their positions.

Defendant also contends that because Dunafan was active in the union, she would not have given up her union protection to become a manager. Shop Rite points to the fact that when an independent operator offered her a management position and told her that if she accepted it he could fire her, Dunafan turned it down. This court found, however, that Dunafan believed she would be terminated if she took the promotion. *See* Finding of Fact # 49, Memorandum Opinion & Order, May 2, 1977. Furthermore, Dunafan testified at trial that although she would not accept such an offer laced with threats, she would have accepted a management position at another store. The fact that this claimant repeatedly re-

quested a promotion belies defendant's contention that she would not have left the union's protection. She is entitled to receive back pay.

*Eva Yarbrough.*

 Claimant Eva Yarbrough was first employed by Shop Rite or its predecessor on March 19, 1963 and resigned on October 20, 1973. During her entire employment at Shop Rite she worked at store # 342. Although she was classified as a checker, she testified that she did a considerable amount of stocking.

Yarbrough was never promoted or offered a promotion. She testified that she wanted and would have accepted a promotion into any management position in any Dallas store, but was denied the opportunity because of her sex. She repeatedly asked her superiors about a promotion. She testified that after she believed that her superiors were ridiculing her because of her interest in a promotion, she decided not to pursue the matter any further.

Defendant first challenges Yarbrough's willingness to be a manager on the ground that in a letter sent to the store at the beginning of her employment, she requested to remain in store # 342. Defendant contends Yarbrough would have been unwilling to accept a management position at another store. She testified, however, that after she had been employed for a year and a half, she got a car and would have been able to work at any of the Dallas stores. She further testified that when she requested a promotion, she specifically informed her superior that she would be willing to transfer to another store.

Defendant challenges Yarbrough's ability to work on the grounds that she was required to take several leaves of absence and that her health was poor. The trial testimony revealed, however, that in her 10½ years of employment, Yarbrough took three relatively short leaves of absence. She admitted at trial that she had a rib removed and that she had some problems lifting. The evidence indicated that despite these disabilities, she was able to stock food and carry groceries. Furthermore, several male managers retained their positions even though they suffered from serious ailments, including cancer and back problems, which impaired their ability to lift heavy items.

Defendant further contends that Yarbrough would not have accepted a position as manager because she would have lost her union retirement benefits. She testified at trial, however, that she did not know whether a promotion would have caused her to lose her retirement. Her requests for a promotion indicate that even if she was aware that advancement would sacrifice her benefits, she preferred a promotion.

Finally, defendant argues that Yarbrough was unqualified for a promotion because she received two reprimands. The standard this court must apply, however, is not whether Shop Rite would have been wise to promote a claimant, but whether a male under comparable circumstances would have been promoted. The record indicates that a number of males who were promoted had one or more reprimands in their files. Additionally, Yarbrough's reprimands were for minor infractions.

Defendant failed to establish with clear and convincing evidence that Yarbrough would not have been promoted. She is entitled to receive back pay based on the difference between the salary that the comparability formula indicates she would have received absent discrimination and the salary she did receive from June 6, 1971 until October 20, 1973, the date she resigned from her job with Shop Rite.

*Maudie Simpson.*

Claimant Maudie Simpson was employed by Shop Rite from October 31, 1974 until May 8, 1976. Originally employed as a bakery clerk in store # 348, she became a checker in the latter part of 1975. Before her job with Shop Rite she had helped her father with his grocery store and had worked in a bakery. Simpson testified that because of her sex she was denied the job of assistant baker in November, 1974. She also claims that she was prevented from

becoming an assistant manager and a manager.

In November, 1974, the assistant baker in store # 348 was made head baker and Simpson asked him if she could become his assistant. He told her he would not allow a woman to be his assistant and hired his son instead. She testified that after appealing unsuccessfully to the assistant manager and manager of the store, she asked her assistant manager if she could move into the produce department and become produce manager. Simpson further testified that the assistant manager "laughed it off." She eventually moved out of the bakery and, taking a cut in pay, became a checker. She explained that she was willing to earn less money because she thought that as a checker she would have a better chance for a promotion. Simpson stated that in order to advance in management she would have worked at any store and kept any hours.

Simpson established that she was a victim of defendant's sex discrimination and Shop Rite did not successfully rebut her case. She is entitled to receive back pay based on the difference between her actual salary and the salary she would have received as an assistant baker accruing from November, 1974. She is also entitled to receive back pay for whatever managerial position that the comparability formula indicates she should have attained. The application of the formula and her precise back pay entitlement will be determined in Phase III.

*Carolyn Lamb.*

Claimant Carolyn Lamb was first employed by Shop Rite as a part-time checker from June 5, 1972 until June 9, 1973. She was rehired by Shop Rite on September 28, 1973 and worked as a checker until her store closed in September, 1977. Although she was considered part-time, she worked between 30 and 40 hours a week.

Lamb was never promoted or offered a promotion to any management position. She claims that because of her sex, she was prohibited from becoming a produce manager and an assistant manager and testified that she would have accepted a management position at any of the Dallas stores. After a male was appointed to the position of assistant manager of store # 340, Lamb told her store manager that she had wanted the job and was disappointed that she had not received the promotion. Lamb testified that she was required to train the new assistant store manager in many grocery procedures. The claimant also testified that she made no further inquiries about being promoted because she believed they would have served no purpose.

The claimant sufficiently established that she was a victim of discrimination and the defendant has conceded that Lamb was "possibly qualified." She is entitled to receive back pay. Her work history reconstruction should commence September 28, 1973.

*Rosemary McDowell.*

Claimant Rosemary McDowell was employed by Shop Rite as a part-time checker from June 10, 1974 until November 3, 1976, at store # 345. This court has already found that she was denied full-time employment, which she actively sought, because of her sex. Finding of Fact # 54, Memorandum Opinion & Order, May 2, 1974. McDowell testified that she asked her store manager as well as the Dallas District Meat Department supervisor about a promotion. She further testified that she would have worked as a produce manager or assistant manager at any Dallas store. She claims that the defendant excluded her from these positions because of her sex. Defendant has conceded since trial that McDowell was "possibly qualified" to be a produce manager. She is entitled to receive back pay for whatever position that she should have attained under the comparability formula.

*Ruth Brammer.*

 Claimant Ruth Brammer was first employed by Shop Rite in its Fort Worth district from September 30, 1966 until January 30, 1971. She was re-employed by Shop Rite in its Dallas District on May 5, 1971. Except for a brief period in August, 1975 when she worked for the Fort Worth dis-

trict, she continued to work there until August 3, 1977, when her store closed. She worked for a few months as a non-foods clerk and the remainder at the time as a checker.

She never requested a promotion. She testified at trial that her silence resulted from her belief that such an inquiry would be futile and not from a lack of interest in advancement. She also stated that she was denied the positions of manager and assistant manager because of her sex.

Claimant, because of her "unexpressed desire, credible and convincing," established a prima facie case. *Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 369, n. 63, 97 S.Ct. 1843. Defendant's efforts to rebut it were unsuccessful. Shop Rite first points to the fact that during her 10½ years of employment, she received two reprimands. The first was because on one occasion her register was short. Claimant testified, and Shop Rite did not dispute, that the next day the missing money was found. The second reprimand was for leaving the cover off her register. Brammer admitted the validity of this reprimand but testified that her omission was not intentional. In light of the fact that a number of male employees were promoted to managerial positions despite the receipt of reprimands, the court does not find Brammer's reprimands were clear and convincing proof that she would not have been promoted.

Defendant also claims that Brammer's alleged nerve and back problems would have prevented her promotion. Shop Rite did not elaborate on these ailments at trial sufficient to constitute clear and convincing proof that claimant would not have been promoted. Although Brammer testified that she had some back problems, she stated that they did not interfere with her job as checker and would not have hindered the performance of her managerial duties. She admitted that she did not like lifting, but denied that she had told her superiors that she was unable to lift.

Because of the break in Brammer's employment, her work history must be reconstructed beginning May 5, 1971.

*Grace Massey.*

Claimant Massey was employed by Shop Rite from January 31, 1966 until June 11, 1977. She also worked as a checker for defendant's predecessor company from April 1, 1963 until March 9, 1965. She worked the entire time as a checker, a job one of her store managers testified that she performed well. She also functioned as head cashier, a position the responsibilities of which include both checker's and office work.

Ms. Massey never asked for a promotion. The court nonetheless finds that she had "an unexpressed desire, credible and convincing." *Id.* She testified that she did not ask for a promotion because she realized the inquiry would be futile. She knew that at least one other competent female had requested a promotion to no avail. Massey testified that she was denied the positions of assistant manager and store manager because of her sex, and would have accepted one of those managerial positions at any Dallas store.

Defendant challenges Massey's claim on three grounds. Shop Rite contends first that Massey was not competent to perform managerial duties, second, that her child care responsibilities prevented her from taking on the longer hours that a manager must put in, and third, that her health was poor.

Massey did admit that she had some difficulty performing certain office work. Defendant's evidence did not establish, however, that males were required to be proficient in office procedures as a condition of promotion into management.

Defendant did not establish by clear and convincing evidence that Massey's child care duties would have kept her from becoming a manager. Massey testified that although she worked the early shift because of her children, she could have worked the late shift. She also stated that she did have a problem with her work hours for a week or two because of one of her children. That difficulty apparently was worked out and

was insufficient to prevent her from holding a management position.

Massey also had three leaves of absence while working for Shop Rite. There was no evidence that the health problems which caused her to go on leave ever otherwise interfered with her job performance. Massey is entitled to receive back pay.

### Lois Smith.

■ Claimant Lois Smith was employed intermittently by Shop Rite from September, 1970 until August, 1976. Initially she worked until April, 1971. She was rehired on August 7, 1971 and worked until December 8, 1972. From December 8, 1972 until May 6, 1973, Smith was listed as on a leave of absence. During her leave, Shop Rite attempted to terminate her, but as a result of a union grievance, she was ultimately reinstated effective December 7, 1972. On June 5, 1973, she again resigned and was rehired October 1, 1974 as a bakery clerk. Shortly thereafter, she again resigned. She was rehired on July 20, 1975 and worked as a checker until August 21, 1976.

During her entire employment, she worked as a checker. She was never promoted or offered promotion to produce manager or assistant manager. She testified she wanted such promotions and would have accepted a managerial position in any Dallas store. She further testified that she asked several of her managers if she could be the assistant manager.

Shop Rite contends that Smith would not have been able to accept the managerial position. Because she had the primary responsibility for the care of her six children, and because she had problems with her husband who beat and harassed her, Shop Rite states that Smith was unable to be a reliable employee. Shop Rite points for support to her spotty employment record. Smith contends, however, that the extra money she could have earned in a managerial position would have enabled her to hire child care and to continue working.

During the six years that this claimant was employed, she was on leave for roughly three years. She has not established a prima facie case that she wanted, would have accepted, and was qualified for a promotion. She thus is not entitled to recover any back pay.

### Mildred Hayes, Waldine Kent, Janice Brooks, and Cynthia Burks.

Although they all received notice, claimants Mildred Hayes, Waldine Kent, Janice Brooks, and Cynthia Burks did not appear to testify during Phase II of this proceeding. Shop Rite cannot be required to pay back wages to claimants whom it had no opportunity to cross examine. Their claims must be disallowed.

### Catherine Pugh.

This claimant worked for Shop Rite from May 1, 1967 until October 18, 1977. While at Shop Rite, she was a checker, an office girl, a non-foods clerk, a meat wrapper, and worked in produce. She believes she was denied all managerial positions from produce manager to supervisor because of her sex. Although she was never offered any of these jobs, she testified that she wanted a promotion and would have accepted any managerial position at any store.

Defendant contends that Pugh's work record establishes she was unqualified for promotion. While working for Shop Rite, she received a number of oral and written reprimands. During the first five years of her employment, however, she received no reprimands and defendant has not introduced any evidence demonstrating that before 1972, Pugh would not have progressed normally. Furthermore, Pugh began receiving reprimands at the time that Shop Rite was trying to eliminate its top paid help. She was finally terminated in 1975, but reinstated after filing a union grievance. Finally, the evidence showed that a number of male employees were promoted despite having received reprimands. Defendant did not establish through clear and convincing proof that Pugh would not have progressed as her male counterparts did. She is entitled to receive back pay.

*Mildred Marie Brown.*

This claimant was employed by Shop Rite from November 23, 1968 until April 12, 1977. She worked as a produce clerk unloading trucks, stocking, and ordering. In 1971 she was transferred to nonfoods. She was a checker but continued to do some stocking of produce and frozen foods.

She claims she was denied a position as produce manager because of her sex. She asked for the job on three different occasions and would have worked as a produce manager in any store in the Dallas area.

Defendant tried to overcome this claimant's prima facie case on the basis of her work performance and her alleged health and personal problems. Claimant received a number of reprimands during her employment. She was not reprimanded while she was working in produce or at any time before 1972. The reprimands she did receive were for errors in checking, and the evidence did not establish that produce managers needed checking skills. One of Brown's former managers testified that she did not have problems doing stocking.

Certain of defendant's witnesses testified Brown was very nervous, unhealthy, and may have had a drinking problem. Her reprimands indicated that whatever problems she may have had only affected her performance as a checker and not her abilities to work in produce. These alleged problems did not interfere with her attendance until October 28, 1976, when she went on sick leave until February 14, 1977.

Brown is entitled to receive back pay as a produce manager.

*Marie Stricklen.*

Marie Stricklen was employed by Shop Rite from May 1, 1952 until September 30, 1977. She did not transfer to the Dallas district until April, 1968, however. She claims that she was denied the position of meatcutter because of her sex.

Until January, 1974, Stricklen was not offered or notified of any vacancies in the Apprentice Meatcutter positions. In January, 1974, Shop Rite, pursuant to its contract with the union representing meatwrappers and meatcutters, sent a letter to all meatwrappers notifying them of a vacancy in the apprentice meatcutter position. When the store's head meatcutter told her that she would be laid off if she accepted the job, she did not pursue the position. Stricklen testified that she wanted a promotion and under other circumstances would have accepted it. She established a prima facie case which the defendant did not overcome.

Certain testimony during Phase II indicated that a number of vacancies occurred in the Assistant Meatcutter position while this claimant was in the Dallas district. This court lacks the information at this time, however, to develop a comparability formula for the reconstruction of this claimant's work history. During Phase III the Special Master will receive such evidence including data on the sex breakdown of the pool from which Assistant Meatcutters were selected, and median length of a person's employment before his promotion to assistant meatcutter, the median tenure of an assistant meatcutter before his promotion to meatcutter, and the precise number of vacancies in assistant meatcutter and meatcutter positions from 1968 until the store in which Stricklen worked closed. The master will determine Stricklen's back pay accordingly.

*Further Proceedings*

In Phase III of this proceeding, a Special Master will calculate precise back pay awards. It will be necessary in applying the comparability formula set forth in this opinion for the master to determine the median length of a male employee's tenure before promotion to the next position. The parties have already submitted exhibits and briefs on this issue. The master must also receive evidence to establish the income of the various managerial ranks. In determining the salary of produce managers, the master will be guided by the union contract that governs such salaries. Should it develop that within each of the other managerial ranks the employees earned different sala-

ries, the master should determine the median salary. Finally, back pay awards "should include more than 'straight salary.'" *Pettway v. American Cast Iron Pipe Co., supra,* 494 F.2d at 263. Such items as bonuses, fringe benefits, and interest must not be omitted. *Id.* The master should take evidence and make recommendations to the court on what the proper rate of interest should be, on whether back pay awards should include an inflation factor and on whether the court should arrange for the payment of taxes. This list is not necessarily exhaustive. The master, guided by the precepts that unrealistic exactitude in determination of back pay is not required and that uncertainties should be resolved in favor of the claimants, should use his discretion to make whole the victims of discrimination.

Plaintiff is the prevailing party and thus is entitled to attorneys' fees. 42 U.S.C. § 2000e–5(k). At the end of Phase III, the court will award such attorneys' fees as are reasonable.