**Elmo V. MYERS et al., Plaintiffs,**

v.

**GILMAN PAPER CORPORATION et al., Defendants.**

**Civ. A. No. 1120.**

United States District Court, S. D. Georgia, Brunswick Division.

Jan. 14, 1975.

Fletcher N. Farrington, Savannah, Ga., A. Blenn Taylor, Brunswick, Ga., Jack Greenberg, New York City, for plaintiffs.

Guy O. Farmer, Jacksonville, Fla., Nolly S. Evans, New York City, for Gilman Paper Co.

J. R. Goldthwaite, Jr., Atlanta, Ga., Edward M. Booth, Jacksonville, Fla., Louis P. Poulton, Washington, D. C., for Int'l Ass'n of Machinists.

James Edward McAleer, Savannah, Ga., for United Paperworkers Int'l Union.

Stanley M. Karsman, Savannah, Ga., for Int'l Brotherhood of Electrical Workers.

Joseph S. Farley, Jr., Jacksonville, Fla., for Local 741, IBEW.

## ORDER DETERMINING LIABILITY FOR DISCRIMINATION

ALAIMO, District Judge.

A recent trilogy of decisions by the Court of Appeals for the Fifth Circuit [1] has substantially eased the Court's burden in applying the law to the facts in this action under the equal employment opportunities provisions of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). However, the Court is faced with one substantial issue—the liability of an international union for failure to take affirmative steps to correct discriminatory practices by one of its local unions.

In this class action under Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1866, plaintiffs, five classes of black employees and former employees of Gilman Paper Company, seek affirmative relief in addition to back pay for alleged racial discrimination in employment, promotion, and transfers by Gilman and the defendant Unions.

After filing a charge of discrimination with the Equal Employment Opportunities Commission on May 4, 1970, nine of the plaintiffs received a "Notice of Right to Sue within 90 Days" on September 20, 1972. Receipt of this notice cured a defect in their original complaint which had been filed on September 1, 1972.

This amended complaint alleged that the defendants, Gilman Paper Corporation (hereinafter sometimes referred to as the Company), the United Paperworkers International Union (UPIU), the International Brotherhood of Electrical Workers (IBEW), the International Association of Machinists, the International Association of Machinists and Aerospace Workers (IAM), Locals Numbered 453, 446, and 958 of the UPIU, Local 741 of the IBEW and Local 1128 of the IAM had been engaged in racial discrimination in employment at the Saint Marys Division of the Company in violation of 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiffs prayed for affirmative equitable relief including back pay and attorneys fees.

The procedural steps, taken by the Court in this action, have at best created a substantial controversy between the plaintiffs and Gilman on the one hand and the defendant Unions on the other. In early 1974, plaintiffs and Gilman sought to settle the issues between them by an affirmative action plan in a proposed consent decree along with a substantial payment as back pay. Following the submission of the proposed consent decree, the Court on August 30, 1974, certified the suit as an appropriate class

---

1. Rodriguez v. East Texas Motor Freight, 505 F.2d 40 (5th Cir., 1974) (hereinafter "Rodriguez v. ETMF") ; Herrera v. Yellow Freight System, Inc., 505 F.2d 66 (5th Cir., 1974) and Resendis v. Lee Way Motor Freight, Inc., 505 F.2d 69 (5th Cir., 1974).

action pursuant to Rule 23, Fed.R.Civ.P. Five affected classes were described in the Order, only two of which are of significance at this stage of the litigation, i. e., "Class A" which consisted of three hundred twenty incumbent black employees hired prior to September 1, 1972, continuously employed since that time, and who were still employed as of December 31, 1973; and "Class B" consisting of thirty-four Blacks (or their surviving legal representatives) who had worked for Gilman longer than twelve months but whose employment had terminated by retirement or disability between May 4, 1968, and December 31, 1973. Even though the Unions vehemently opposed the settlement, the Court found the partial settlement fair and equitable and gave the consent decree its stamp of approval. As a result of the partial settlement, focus during the trial of the liability phase on December 2–5, 1974, shifted primarily to the acts and omissions of the defendant Unions. Gilman's practices are placed in issue by the Unions' cross-actions only as far as they affect the Unions' liability.

## I. FACTUAL BACKGROUND

In 1941, Gilman Paper Company, a New Hampshire corporation, began the operation of its St. Marys Kraft Division, a paper mill in St. Marys, Georgia. Its operations there were expanded in 1950 to include the St. Marys Kraft Bag Division which converts paper into bags. Shortly after beginning its operations, Gilman voluntarily recognized the defendant Unions, or their predecessors as the collective bargaining representatives of its employees.

Prior to July 2, 1965, the effective date of Title VII of the Civil Rights Act of 1964 (Title VII), Gilman assigned its black employees only to jobs in the wood yard and the yard labor lines of progression and to certain other jobs not within any line of progression. Jobs in more lucrative and more desirable lines of progression in the Kraft Division (the Mill) and the Kraft Bag Division (Bag Plant) were reserved, almost without exception, for white employees. Prior to July 2, 1965, Gilman did not post job vacancies within traditionally all-white jobs and lines of progression and had never transferred a black employee into a traditionally all-white job or line of progression.

At that time, Local 446 of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers and Local 453 of the United Paperworkers and Papermakers Union [2] represented non-supervisory production employees in the Mill. Local 958, International Brotherhood of Pulp, Sulphite and Paper Mill Workers, represented non-supervisory production employees in the Bag Plant. Locals 446, 453, and 958 were predominantly, if not entirely, "lily white." Local 616, International Brotherhood of Pulp, Sulphite and Paper Mill Workers, represented production and "clean-up" jobs at both the Mill and the Bag Plant to which all Blacks and a few Whites were assigned.

In 1970, after a number of unsuccessful attempts, Local 616 merged into Locals 446 and 958. Prior attempts had been thwarted by a number of factors, including the refusal of the members of Local 616 to agree to demands they apparently considered unreasonable. However, in 1970, substantial pressures from the International Union led to the merger and ultimate disbandment of Local 616.

The crux of the liability claim against the defendant Unions involves "job" seniority provisions and the absence of provisions for the posting of job vacancies in the collective bargaining agreements and the plaintiffs' contentions that these agreements constituted present discrimination by their perpetuation of the effects of past discriminatory practice of Gilman Paper Corporation.

2. In 1972, the two International Unions merged to become the United Paperworkers International Union (hereinafter UPIU), at which time Local 453 was redesignated Local 1453. However, for the purposes of this Order, Local 1453 will usually be referred to as Local 453.

Up until Supplemental Labor Agreements were reached in August, 1972, the collective bargaining agreements contained provisions stating that "seniority" would control with respect to promotions, demotions, and layoffs. Section 5 of the 1968 agreement between Gilman and Local 741, IBEW, exemplifies the typical seniority provisions of the various collective bargaining agreements:

"If employees are to be promoted, demoted or laid off, the Management shall take into consideration seniority and ability, and when all the factors that constitute ability are relatively equal, then seniority shall prevail. * * *

"For the purposes of this Agreement there shall be three types of seniority:

"A. Job Seniority . . ..

B. Department Seniority . . ..

C. Mill Seniority . . ..

* * * * * *

"In cases of layoffs *seniority shall prevail.*" (Emphasis added)

Obviously, the meaning of the above provisions with respect to the type of seniority that is controlling for promotions, demotions, and layoffs is not discernible from the above language or any language in the collective bargaining agreement. The other collective bargaining agreements are equally vague. Consequently, the practices recognized by the parties under these vague seniority provisions are of controlling significance in this action.

The evidence at trial showed that, until 1972, "job" seniority, defined uniformly as an employee's time of employment within a line of progression, rather than "plant or mill" seniority, controlled in cases of promotions, demotions, and layoffs. The evidence further showed that, prior to the Supplemental Labor Agreements, job seniority was also important for the purposes of vacation preferences and assignments of overtime work and in limited cases for the choice of shifts.

A critical fact in this case arises from the undisputed testimony that, until 1972, following a thirty-day trial period, an individual transferring from one line of progression to another would lose the benefits of seniority accrued in the line of progression he left and that his seniority in the new line would measure from the time of his entry into the new line of progression. Thus, a Black, hired before 1965 into a traditionally all-black job or line of progression and transferring after 1965 into a formerly all-white line of progression, would have less seniority than a White hired on the same day but initially assigned to that all-white line of progression.

Other evidence, including testimony and the 1968 Labor Agreement between Gilman and the Papermakers Unions, showed that the effects of pre-Title VII discrimination continued after the effective date of Title VII. Until 1970, the *lowest* pay rate for painter helper and carpenter helper job classifications in the carpenters line of progression under the jurisdiction of the "lily-white" Local 446 exceeded the *highest* pay rates for painter helper and carpenter helper trainees classifications under the jurisdiction of Local 616, the predominantly black union.

On July 2, 1965, approximately 125 members of Class A [3] had been hired by Gilman. Twenty were assigned to jobs primarily restricted to Blacks in the Bag Plant; the remaining 105 were restricted to traditionally black jobs at the Mill. After the effective date of Title VII, seventy-seven Class A members were hired at the Mill; Gilman assigned 55 to traditionally all-black jobs; twenty-two were assigned initially to what had formerly been all-white jobs. Between 1965 and 1970, only 19 black employees were transferred from black jobs to white jobs. After the merger of

3. Class A includes 320 incumbent Black employees hired prior to September 1, 1972, continuously employed since that time, and who were employed as of December 31, 1973.

the segregated unions in 1970, but before the Supplemental Labor Agreements in 1972, eleven Blacks transferred to formerly all-white jobs and lines of progression. After the Supplemental Labor Agreements provided for the retention of plant or mill seniority by affected persons and for the posting of job vacancies, thirty-eight members of Class A transferred for the first time to traditionally all-white jobs.

With respect to maintenance jobs under the jurisdiction of Local 1128, IAM, and electrical jobs under Local 741, IBEW, two Class A members transferred to formerly all-white maintenance jobs none to all-white electrical jobs, prior to the 1972 Supplemental Labor Agreements. After the 1972 Agreements, ten transferred to maintenance jobs and eight to electrical jobs.

In summary, the evidence shows and the Court finds that, prior to the effective date of Title VII, Blacks were hired into relatively low paying lines of progression and were prohibited from entering into the higher paying lines of progression in both the Mill and the Bag Plant. While some Blacks were hired into formerly all-white jobs during 1965–72, few Blacks were transferred into formerly all-white lines of progression. From 1965–72, Blacks transferring to traditionally all-white lines of progression, forfeited previously earned seniority for the purposes of demotions, promotions, and layoffs. The Court finds that a black employee, transferring to a formerly all-white line of progression, had less seniority than a white employee, hired the same day but initially assigned to the line of progression to which the Black transferred.

## II. PLAINTIFFS' BURDEN AND CASE

██ In a class action, such as this, under the equal employment provisions of Title VII of the Civil Rights Act of 1964, the burden of proof on the plaintiffs in the liability phase is to show no "more than a prima facie case of discrimination against the class." Rod-

riguez v. ETMF, 505 F.2d 40, 52 (5th Cir. 1974). Upon a showing of a prima facie case, the burden shifts to the defendants:

"The plaintiffs' prima facie case of hiring discrimination, and proof that the seniority system, a creature of the collective bargaining agreement, transmitted the discrimination into the present, shifted the burden to the defendant unions to show that the present discriminatory effects were unavoidable, that is, required as a business necessity." Id. at 61.

██ Plaintiffs have shown the existence of racial discrimination in assignment and transfer practices existing prior to the effective date of Title VII in that no Blacks had ever been hired or transferred into higher paying, traditionally all-white lines of progression. The absence of any notice of job vacancies, together with the system of job seniority within the individual lines of progression, created an impenetrable barrier to black employees seeking to transfer into traditionally all-white lines and gain the positions to which they would have been entitled but for the past racial discrimination. Undoubtedly, plaintiffs have more than carried their burden by showing that the seniority system and the lack of notice of available jobs, prevailing from 1965 to 1972, were significant and substantial factors in perpetuating the effects of past discrimination by discouraging transfers and preventing Blacks from attaining their "rightful place." See Rodriguez v. ETMF, 505 F.2d 40, 61–62 (5th Cir., 1974).

## III. THE UNIONS' DEFENSES

### A. GENERALLY

In general, the defendant Unions argue that they took no part in any discriminatory practices prior to or after 1965, and that Gilman Paper Corporation was *solely* responsible for all racial discrimination in employment, assignments, promotions, and transfers. They also contend that there is no objective evidence in the record that after 1965 job senior-

ity prevent Blacks from transferring to formerly all-white lines of progression.

■ Assuming, without finding, that Gilman was *solely* responsible for all racial discrimination in employment, assignments, promotions, and transfers prior to and after 1965, that fact raises no defense for the Unions. The essence of the plaintiffs' claim against the Unions is that the collective bargaining agreements tended to perpetuate and, in fact, perpetuated past discrimination, thus constituting present discrimination.

■ Recent decisions by the Court of Appeals for the Fifth Circuit leave this Court with the clear understanding that Title VII, as construed in this circuit, places an affirmative duty on labor unions, as well as employers, to take corrective steps to prevent present discriminatory practices, to remove impediments that perpetuate past discrimination, and to place discriminatees into their "rightful place." *See generally* Rodriguez v. ETMF, 505 F.2d 40 (5th Cir. 1974); Carey v. Greyhound Bus Co., 500 F.2d 1372, 1377 (5th Cir. 1974), and Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 243 (5th Cir. 1974).

The Unions misconstrue the assignments of the burdens in this action with respect to their objection as to the lack of objective evidence that job seniority perpetuates past discrimination. Upon the plaintiffs' establishment of a prima facie case of discrimination, the burden shifts to the defendant Unions to show in this case the true cause of the present discriminatory effects. Here, defendants have shown only that the present effects could have emanated from at least two causes: (1) refusal of Gilman to transfer Blacks to all-white jobs; and (2) job seniority as implemented in the collective bargaining agreements. They have not shown any other "objective" cause of the perpetuation of past discrimination. The Court finds that job seniority provisions and practices were at least a concurrent, if not prevailing, cause of the perpetuation of past discrimination in both the Mill and the Bag

Plant. It is further clear to the Court that the Unions until 1972 acquiesced in the discriminatory practices by Gilman Paper Corporation.

Moreover, the Court is satisfied that the statistical evidence elicited by plaintiffs shows that a sufficient causal relationship existed between the job seniority provisions and the absence of notice of vacancies on the one hand and the small number of transfers by black employees. It was only after the introduction of plant or mill seniority and job-vacancy posting by the 1972 Supplemental Labor Agreements that significant numbers of black employees sought and received transfers to formerly all-white jobs and lines of progressions.

Finally, none of the defendant Unions has even attempted to show that the offensive provisions and practices were a product of "business necessity," the only true defense once plaintiffs have established a *prima facie* case of discrimination. *See* Rodriguez v. ETMF, 505 F.2d 40, 61 (5th Cir. 1974).

## B. THE PAPERWORKERS' UNIONS

The United Paperworkers International Unions and its Locals, 453, 446, and 958 contend that in 1970 they did everything within their power to correct past discrimination. During 1970 collective bargaining sessions, these Unions submitted certain seniority and labor pool suggestions they contend were designed to satisfy the requirements of Title VII. Upon rejection of these and other proposals by Gilman, the Unions struck for four weeks. The strike ended when the Unions ratified a contract without the seniority and labor pool provisions.

These Unions' general proposals in 1970 would have continued the vague "Seniority shall prevail" language but would have expanded the terminology to apply to transfers and permanent layoffs in addition to promotions, demotions, and temporary layoffs. Even assuming that the seniority implied in their proposals was mill or plant senior-

ity (there was evidence to the contrary), the proposals would have still provided:

> "A permanent vacancy within a line of progression will be filled by the employee with most Job Seniority . . . .
>
> "Demotions will be made in the reverse order of Job Seniority within an employee's line of progression. Layoffs will occur on the bottom job in the employee's line of progression."

*Compare* 1968 Labor Agreement between Gilman Paper Corporation and United Papermakers and International Brotherhood of Pulp, Sulphite and Paper Mill Workers (Plaintiffs' Exhibit 1) *with* Contract Changes (Plaintiffs' Exhibit 37). While the proposals would have apparently provided for plant seniority for promotion from a "labor pool" to fill vacancies in the various lines of progression, job seniority would remain controlling at least for promotions, demotions, and layoffs. Consequently, while possibly laudatory in some aspects, the proposals failed to meet the primary deficiencies in the existing job seniority system.

### C. LOCAL 741, LOCAL 1128, AND IAM

In addition to the general defenses previously considered, these Unions contend that no Blacks ever complained to them concerning the job seniority prevailing from 1965 to 1972.

 Apparently, they argue that the seniority provisions were bargained for in good faith and that they lacked any intent to discriminate or to perpetuate past discrimination. However, the courts have held that good faith and lack of intent to discriminate do not constitute viable defenses in actions such as this. Baxter v. Savannah Sugar Refining Corp., 495 F.2d 437, 442 (5th Cir.

1974); Pettway v. American Cast Iron Pipe Co., 494 F.2d at 220, quoting Griggs v. Duke Power Co., 401 U.S. 424, 431–32, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974). *See also* United States v. N. L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973).

### D. IBEW

The International Brotherhood of Electrical Workers contends that, even if its Local 741 is found liable for perpetuating past discrimination, the International is not. IBEW argues that its locals are not agents of the International Union [4] and that it was not a signatory to the offensive collective bargaining agreements and had no control over Local 741 in its bargaining with Gilman.

 Assuming these arguments to be factually and legally correct, the mandate of Title VII is one reaching constitutional proportions, not limited by principles of agency or contractual provisions. As previously discussed, that mandate places an affirmative duty on unions to eradicate present discrimination and the effect of past discrimination. *Cf.* Carey v. Greyhound Bus Co., *supra*; United States v. N. L. Industries, Inc., *supra*; Stamps v. Detroit Edison Co., 365 F. Supp. 87 (E.D.Mich.1973), and United States v. Local 357, IBEW, 356 F.Supp. 104 (D.Nev.1972).

While the duty on the International Unions might be more easily met than the Locals' obligation, the IBEW made no effort to show that it took any steps to fulfill the mandates of Title VII and its constitutional underpinning.

Additionally, the Court is of the opinion that the IBEW has failed to fulfill its own declaration of purpose that "Our cause is the cause of human justice, human rights, human security: and that "We refuse . . . to condone or tolerate . . . oppression of any kind."

---

4. Inasmuch as the other international unions, the United Paperworkers International Union and International Association of Machinists and Aerospace Workers, are parties to the collective bargaining agreements along with the respective locals and are therefore principals to such contracts, no issue concerning the existence of an agency relationship is raised with respect to those unions.

(IBEW Constitution, inside front cover, 1970).

■ In answer to IBEW's argument that it cannot possibly police the effect of its 1,675 locals' collective bargaining agreement, the Court finds that IBEW has International Representatives who are knowledgeable in the activities of its locals and through whom the IBEW could take reasonable steps to assure compliance with the mandates of Title VII. Furthermore, the IBEW Constitution provides sufficient power in the International Union to effectuate reasonable steps toward compliance; any agreement put into effect by one of the local unions without prior International approval is null and void; agreements not in compliance with International Constitution or policies can be corrected by the International Union (IBEW Constitution Art. XVII, § 7); and power exists to revoke the charters of the local unions (Art. XV, § 4).

In summary, the Court finds that none of the defendant Unions has carried its burden in rebutting the plaintiffs' *prima facie* case and that none has succeeded in establishing a viable defense.

## IV. BREACH OF DUTY OF FAIR REPRESENTATION

Alleging racially discriminatory treatment, plaintiffs contend that Local 958, UPIU, refused for racial reasons to pursue all steps in established procedures and failed to take to arbitration the cases of plaintiff Arthur Dawson and George Jones, who, plaintiffs claim were wrongfully discharged by Gilman Paper Corporation.

From the absence of any suggested findings on this issue in plaintiffs' Proposed Findings of Fact, filed December 23, 1974, it appears that plaintiffs have wisely abandoned the allegations of Local 958's failure to fulfill its duty of fair representation for racial discriminatory reasons.[5] The evidence at trial showed and the Court so finds that the

Union did not refuse to pursue grievance procedures, including arbitration, for reasons of the race or color of these two plaintiffs. To the contrary, the evidence showed that grievance procedures were activated to a point at which the Union membership reasonably determined by vote that further procedures should not be pursued. Plaintiffs failed to elicit any evidence, statistical or otherwise, that the Union's decision not to arbitrate the grievances of these two plaintiffs was motivated by racial discrimination. Consequently, the Court concludes as a matter of law that plaintiffs have failed to carry their burden of proof and that these claims should be dismissed with prejudice.

## V. CONCLUSIONS OF LAW

### A. JURISDICTION

1. This Court has jurisdiction of this action under Section 706 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under the Civil Rights Act of 1866, 42 U.S.C. § 1981.

2. Defendant Unions are labor organizations within the meaning of Section 701(d) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d).

3. In filing the May 4, 1970, charge of discrimination, and by receipt of the September 20, 1972, right-to-sue letter, plaintiffs have met the statutory prerequisites for maintenance of this action under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–5(e).

### B. DISCRIMINATION

■ 1. The maintenance of segregated local unions by the UPIU and its Locals 616, 446, and 958 constituted a violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–2(c)(2); United States v. International Longshoremen's Assn., 460 F.2d 497 (4th Cir. 1972); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971); Hicks v. Crown Zellerbach Corp., 310 F.Supp. 536 (E.D.La.1970).

---

5. Plaintiffs and Gilman settled the issue between them by an agreement to take the propriety of the discharges of these two plaintiffs to arbitration.

2. A system of granting promotions and transfers whereby incumbent black employees previously assigned to low-paying, all-black jobs are required to forfeit, upon transfer to previously white jobs, their accumulated seniority, violates Title VII of the Civil Rights Act of 1964. Rodriguez v. ETMF, 505 F.2d 40 (5th Cir., 1974); Johnson v. Goodyear Tire and Rubber Co., 491 F.2d 1364 (5th Cir. 1974).

3. A transfer system whereby black employees who have been initially assigned to black jobs are not notified of job vacancies in white departments as they occur violates Title VII of the Civil Rights Act of 1964. *Cf.* Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974).

### C. UNION LIABILITY

1. In a Title VII case such as this one, it is not necessary to show that the Unions have discriminated in order that liability attach. All that need be shown is that, prior to the effective date of the Act, the Company engaged in racial discrimination, and that, after the effective date of the Act, the previous discriminatory policies were carried forward by the racially neutral practices of the Unions. Rodriguez v. ETMF, 505 F.2d 40 (5th Cir., 1974); Carey v. Greyhound Bus Co., 500 F.2d 1372 (5th Cir., 1974); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974). The primary basis of the Unions' liability is their joining with the Company in the collective bargaining agreements which so clearly carried forward the Company's prior discrimination. That participation renders the Unions liable for the violations of Title VII which have been noted herein. *Carey,* supra; *Rodriguez,* supra; *Johnson,* supra.

2. The failure of members of Local 616 to achieve merger on their own accord with the formerly white unions presents no bar to their now seeking, and receiving, injunctive and compensatory relief from the discriminatory practices found to exist herein. Rodriguez v. East Texas Motor Freight, *supra.*

3. The IAM and IBEW and their Locals do not escape liability on grounds that they had no "duty of fair representation" because members of the affected class were not members of their Unions. Waters v. Wisconsin Steel Works of International Harvester Co., 502 F.2d 1309 (7th Cir. 1974); Carey v. Greyhound Bus Co., *supra.* Neither do they escape liability because they are craft unions, nor because promotion to some jobs under their jurisdiction is not through lines of progression. Johnson v. Goodyear Tire & Rubber Co., *supra.* The evidence is compelling that black employees did not transfer to jobs under the jurisdiction of those Unions because of the collective bargaining agreements between those Unions and the Company. The ineffectual passivism of those Unions in failing to renegotiate the discriminatory provisions of their contracts is sufficient to impose liability under Title VII of the Civil Rights Act of 1964. Carey v. Greyhound Bus Co., *supra.* It is thus immaterial whether or not black employees injured by the provisions of those collective bargaining agreements were members of the IAM and the IBEW.

4. UPIU and IAM have conceded the existence of an agency relationship between themselves and their local unions. IBEW contends that no agency relationship exists between it and Local 741. Notwithstanding, IBEW is still liable to the plaintiffs here for its own actions and omissions. The mandate of Title VII to right the wrongs of past discrimination places a duty even on International Unions to take reasonable affirmative steps to assure compliance with Title VII. By failing to show that it has taken any steps to assure its Local's compliance with Title VII, IBEW becomes liable for its own unreasonable inaction.

5. Because the Unions are equally responsible, with the Company, for the perpetration of past racial discrimination, they must bear liability

equally with the Company. Accordingly, the Unions shall be liable for 50% of the economic loss suffered by each individual class member. United States v. United States Steel Corp., 7 F.E.P. Cas. 320 (N. D.Ala.1973), (Findings issued, D.C., 371 F.Supp. 1045); Cf. Bush v. Lone Star Steel Co., 373 F.Supp. 526 (E.D. Tex.1974), back pay liability one-third against Company, one-third against Local Union, and one-third against International Union). This 50% shall hereafter be referred to as the "Unions' share."

## D. SUBCLASSES

■■ 1. This is a suit in equity. District courts are afforded wide latitude to fashion a remedy to fit the violation. Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); Local 53, Heat & Frost Insulators v. Vogler, 407 F.2d 1047 (5th Cir. 1969); Rodriguez v. East Texas Motor Freight, supra; Baxter v. Savannah Sugar Refining Corp., .495 F.2d 437 (5th Cir. 1974); Johnson v. Goodyear Tire & Rubber Co., supra. Under these principles:

(a) Local 958 and UPIU are the exclusive bargaining representatives for employees at Kraft Bag. Accordingly, Local 958 and UPIU shall be jointly liable for the Unions' share of any economic loss suffered as a result of the discriminatory practices found to exist herein by members of Classes A and B who are or were employees of the St. Marys Kraft Bag Division.

(b) Locals 446 and 453, and UPIU, represent approximately 72% of the employees at the Mill who work in bargaining unit jobs. Accordingly, Locals 446 and 553, and UPIU are liable for 72% of the Unions' share of the economic loss suffered as a result of the discriminatory practices found to exist herein by members of Classes A and B who are or were employees of the St. Marys Kraft Division.

(c) Local 1128 and IAM represent approximately 18% of the employees at the Mill who work in bargaining unit jobs. Accordingly, Local 1128 and IAM are jointly liable for 18% of the Union's share of the economic loss suffered as a result of the discriminatory practices found to exist herein by members of Classes A and B who are or were employees at the Mill.

(d) Local 741 and IBEW represent approximately 10% of the employees at the Mill who work in bargaining unit jobs. Accordingly, Local 741 and IBEW are responsible for 10% of the Unions' share of the economic loss suffered as a result of the discriminatory practices found to exist herein by members of Classes A and B who are or were employees of the Mill.

## E. FURTHER RELIEF

1. The Unions advanced no business justification at the trial for delaying implementation of the affirmative remedies contained in the consent decree approved on November 11, 1974. Cf. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Accordingly, the provisions of that decree shall become effective as scheduled on January 1, 1975.

■■ 2. Plaintiffs have shown that members of Classes A and B were locked-in to their black jobs because of the practices of the Unions described herein. Accordingly, they are presumptively entitled to an award of back pay. Upon the trial of the next stage, plaintiffs will be required to show, with reasonable accuracy, the amount of economic loss of each class member who was initially assigned to a black job. United States v. Georgia Power Company, 474 F.2d 906 (5th Cir. 1973); Johnson v. Goodyear Tire and Rubber Co., supra. To that end, plaintiffs shall prepare their evidence and present same to the Unions within thirty (30) days following the entry of these Findings and Conclusions, and shall notify the Court as soon as such evidence has been presented to the Unions. As soon as possible following thirty (30) days from such presentation,

the Court will set the remaining issues down for hearing.

3. Once plaintiffs have made a prima facie showing of economic loss by members of Classes A and B, the Unions shall be liable for such economic loss of each individual in the proportions set forth above, unless the Unions can show, by convincing evidence, that other factors would have prevented an individual's transfer regardless of the discriminatory practices. The Unions' proof must be based on objective considerations, must be clear and convincing, and any doubts must be resolved in favor of class members. Johnson v. Goodyear Tire & Rubber Co., *supra*; Pettway v. American Cast Iron Pipe Co., *supra*.

So ordered, this 14th day of January, 1975.