Elmo MYERS, et al., Plaintiffs,

v.

GILMAN PAPER COMPANY, et al., Defendants.

Civ. A. No. CV 1120.

United States District Court, S. D. Georgia, Brunswick Division.

Nov. 4, 1981.

Fletcher Farrington, Savannah, Ga., A. Blenn Taylor, Jr., Brunswick, Ga., Jack Greenberg, New York City, for plaintiffs.

Louis P. Poulton, Washington, D. C., J. R. Goldthwaite, Jr., Atlanta, Ga., for IAM and Local 1128 IAM.

Guy O. Farmer, II, Jeffrey H. Klink, Gavin S. Appleby, Catherine C. Cosby, Jacksonville, Fla., Gail B. Chasin, New York City, for Gilman Paper Co.

James Edward McAleer, Savannah, Ga., Benjamin Wyle, New York City, for UPIU, Locals 453, 446, and 958.

Elihu I. Leifer, Washington, D. C., Stanley Karsman, Savannah, Ga., for IBEW.

John C. Falkenberry, Birmingham, Ala., for Local 741, IBEW.

## MEMORANDUM OPINION

ALAIMO, Chief Judge.

### I. *Introduction*

This long and complicated Title VII class action is about to enter Stage II proceed-

ings to determine the backpay liability of defendant United Paperworkers International Union (UPIU). This international, through its respective local, represented employees of the Gilman Paper Company plant in St. Mary's, Georgia, and was found by this Court to have helped create and maintain a seniority system with the intent to discriminate against black workers in that plant in violation of § 703(c) of Title VII.[1] Memorandum Opinion of February 18, 1981. The case is currently before the Court on the motions of the plaintiffs and UPIU for partial summary judgment on various backpay issues.

▪ Each moving party has briefed its theory of the burden of proof in these proceedings and then postulated what issues are no longer in controversy given the allocation of such burdens. The plaintiffs contend that all each claimant needs to demonstrate to qualify for backpay is his employment in a job at St. Mary's under the former jurisdiction of all black labor union Local 616 of UPIU, and the history of that employment—both elements of which are already established in the record. Further, they submit that the complexities of the case demand a class-wide formula to determine the backpay of each injured employee. Thus, "there is nothing left for trial but the unions' claims, if there are any, that any individual would never have moved to a better job, or that the calculations [of backpay] are in some respect incorrect."[2] UPIU contends that a showing of specific harm must be made by each individual class plaintiff, and that the individual plaintiffs have yet to make such a showing. UPIU also argues that certain categories of backpay claimants are not entitled to backpay as a matter of law given the factual findings of the Court in its February 18, 1981 Opinion concerning the extent of the discriminatory seniority system.

This Court agrees with UPIU that the plaintiffs have not introduced sufficient evidence to show which class members are eligible for backpay. The Court, therefore, DENIES plaintiffs' Motion for Partial Summary Judgment but holds that those class members with jobs under the jurisdiction of former black Local 616 between July 2, 1965 and June 6, 1970 must file a proof-of-claim form to qualify for backpay and that backpay hearings will be held for any disputed claims. Further, the Court DENIES all of UPIU's Summary Judgment Motions to reduce the size of the class eligible to participate in backpay hearings EXCEPT their motion in regard to the twenty-one (21) claimants listed in the Appendix to Plaintiffs' Motion for Partial Summary Judgment whose names were not on the list of classes certified by this Court to bring an action in its Order of August 30, 1974.

## II. *Discussion*

▪ It is now well settled that backpay awards are an integral part of Title VII class action relief. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Money damages are a component of the "rightful place" theory of Title VII compensation: the idea that although courts cannot turn back the clock and eliminate the discrimination that has already occurred, they can award an injured discriminatee the pay he would have received had there been no discrimination less the pay he received as a result of such discrimination. *See Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763, 96 S.Ct. 1251, 1263, 47 L.Ed.2d 444 (1976); *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1194 (5th Cir. 1976); *Jones v. Glitsch, Inc.*, 489 F.Supp. 990, 993 (N.D.Tex.1980). This requires a court to recreate the employment history of the individual victims and hypothesize the time and place of each employee's advancement absent the unlawful

---

1. The other defendant found liable in the February 18, 1981 Opinion, the International Brotherhood of Electrical Workers, has settled all claims asserted against it by the plaintiffs. The parties' settlement agreement was approved by this Court in an Order dated October 5, 1981.

2. Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment, March 13, 1981, p. 2. In the Appendix to their Motion, the plaintiffs listed 258 individuals said to be eligible for backpay.

practice. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 372, 97 S.Ct. 1843, 1873, 52 L.Ed. 2d 396 (1977); *Franks, supra,* 424 U.S. at 769, 96 S.Ct. at 1266. It is, of course, a rough and imprecise process, and the degree of conjecture rises with the size of the class, the ambiguity of the promotion or hiring practice, and the multiple effects and prolixity of the illegal practices. *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 261 (5th Cir. 1974) (hereinafter *Pettway* I). When the variables reach a level such that the process becomes a "quagmire of hypothetical judgments," the district court should opt for a class-wide formula in measuring backpay. *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1379 (5th Cir. 1974). *See Claiborne v. Illinois Cent. R.R.,* 583 F.2d 143, 150 (5th Cir. 1978), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1213 (5th Cir. 1978) (hereinafter *Pettway* II), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *United States v. U.S. Steel Corp.,* 520 F.2d 1043, 1055 (5th Cir. 1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); *Pettway* I, *supra,* 494 F.2d at 260–262.

■ Before a court determines the lost earnings of each class member, however, it must determine which class members were actual victims of the discriminatory process. Stage I proceedings only focus on the defendant's broad discrimination policies and practices against a class—individual effects are not in issue. *U.S. Steel, supra,* 520 F.2d

at 1053. But backpay compensation is intended to be individually apportioned according to individual merit, so once the action moves to the remedial stage individual effects are at issue. Within a class, individual circumstances are varied and diverse and the presumption of discrimination against the class that emerges from Stage I cannot automatically entitle each member to recover backpay. *Johnson, supra,* 491 F.2d at 1375. The burden on each class member is to show that he is a potential victim of the discrimination. *Teamsters, supra,* 431 U.S. at 362, 97 S.Ct. at 1868. He must "bring himself within the class and . . . describe the harmful effect of the discrimination on his individual employment position." *Pettway* I, *supra,* 494 F.2d at 259. Once this is shown the burden shifts "to the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons," such as a lack of employment qualifications or the unavailability of vacancies.[3] *Teamsters, supra,* 431 U.S. at 362, 97 S.Ct. at 1868. *See Franks, supra,* 424 U.S. at 773 n.32, 96 S.Ct. at 1268 n. 32.

This is not to say that computation of lost earnings and the burden of proof as to eligibility are wholly separate processes. Recreating a discriminatee's employment history to determine the amount of his lost earnings is simply an effort to determine how he was actually victimized by the discrimination. Nevertheless, while a court may switch to a class-wide approach to determine the actual amount of backpay, each individual claimant must still make a

---

**3.** UPIU argues that the burden of persuasion regarding a claimant's entitlement to backpay can never shift to the defendant, and cites for support the very recent Supreme Court decision in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Burdine* did hold that the establishment of a *prima facie* case of discrimination under the test of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) does not shift the burden of proof but only creates a mandatory rebuttable presumption. Furthermore, the Court in *Teamsters* did review the principles of *McDonnell Douglas* in clarifying the proof required of class plaintiffs when seeking individual relief. Thus the implication is that as *Burdine* reinterpreted

*McDonnell Douglas,* so too did it reinterpret *Teamsters.* But the *Teamsters* Court specifically rejected the notion that a class member in Stage II proceedings must make a *McDonnell Douglas* type showing. It instead required a more limited showing: identification of the employment opportunities members sought or would have sought and qualifications for them. *Teamsters, supra,* 431 U.S. at 361, 362, and 369, 97 S.Ct. at 1867, 1868, 1871–1872. Thus UPIU's contention that the plaintiffs' burden in proving individual harm can never shift is rejected. *See Chewning v. Schlesinger,* 471 F.Supp. 767 (D.D.C.1979) (*Teamsters* mandates more limited showing in relief stage than needed to establish *prima facie* case under *McDonnell Douglas*).

threshold presentation of some evidence that he qualifies for backpay given the particular circumstances of the case. *Pettway I, supra,* 494 F.2d at 261, 262 n.151. *See U.S. Steel, supra,* 520 F.2d at 1055; *Johnson, supra,* 491 F.2d at 1379. And just as the complexities of a case mandate that a court be flexible in fashioning a computation approach, so too does the court have flexibility in fashioning the criteria the individual claimant must present to prove he was a potential victim. *See Carter v. Shop Rite Foods, Inc.,* 470 F.Supp. 1150, 1155 (N.D.Tex.1979); *Younger v. Glamorgan Pipe & Foundry Co.,* 418 F.Supp. 743, 769 (W.D.Va.1976), *rev'd per curiam on other grounds,* 561 F.2d 563 (4th Cir. 1977).

In the instant case the discriminatory employment practice was the maintenance of a line of progression seniority system designed to impede the advancement of black workers. Prior to 1965 the Gilman Paper Company intentionally assigned black employees to poor-paying, artificial job lines. Under the union-bargained seniority system, job-line transferees lost all line and plant seniority and thus ran the risk of being laid-off. *Myers v. Gilman Paper Co.,* 392 F.Supp. 413, 418 (S.D.Ga.1975), *aff'd in part, rev'd in part,* 544 F.2d 837 (5th Cir. 1977). The company's discriminatory assignment policy was relaxed following implementation of the Civil Rights Act of 1964; however, the artificial line of progression seniority system was continued in order to deter blacks from seeking and receiving transfers and promotions in the formerly all white job lines.

Each potential victim of the seniority system should be able to demonstrate its deterrent effect upon his employment history. Guidance as to the type of evidence needed to show such deterrence is provided by the Supreme Court's opinion in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). There the Court addressed the question of an incumbent employee's burden of proof to show entitlement to seniority relief when class-wide discrimination may have prevented the incumbent from advancing but the incumbent failed to apply for a better job. Justice Stewart, writing for the Court, said that the incumbent has the "not always easy burden of proving that he would have applied for the job had it not been for the discriminatory practices," *Id.* at 368, 97 S.Ct. at 1871, and held that such a burden was met by a showing of what jobs the incumbent actually wanted and "the basic information about his qualifications that he would have presented in an application." *Id* at 371 n.53, 97 S.Ct. at 1872 n.53. Evidence "of an employee's informal inquiry, expression of interest [to non-management personnel], or even unexpressed desire credible and convincing," would likely carry the burden of proof. *Id.* at 371 n.58, 97 S.Ct. at 1873 n.58. The burden would then shift to the defendant to "show that the nonapplicant was nevertheless not a victim of discrimination." *Id.* at 369 n.53, 97 S.Ct. at 1872 n.53.

The *Teamsters* standard for determining eligibility for retroactive seniority has been employed in varying degrees to determine the eligibility of individual backpay claimants. *See Hill v. Western Electric Co.,* 596 F.2d 99 (4th Cir.) (claimant must show positions desired, qualifications, willingness to accept, and availability of vacancy), *cert. denied,* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979); *Mitchell v. Mid-Continent Spring Co. of Kentucky,* 583 F.2d 275 (6th Cir. 1978) (claimant must show jobs desired and fitness for them), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979); *Ingram v. Madison Square Garden Center, Inc.,* 482 F.Supp. 918 (S.D.N.Y.1979) (claimant must show jobs desired, qualifications, and willingness to apply but for discriminatory practices); *Carter v. Shop Rite Foods, Inc.,* 470 F.Supp. 1150 (N.D.Tex. 1979) (claimant must show she wanted promotion and would have accepted if offered).

■ This Court thinks that the circumstances of this case require each claimant to submit evidence of the jobs in so-called white lines of progression to which he had wished to advance and his qualifications for such positions. Such a threshold presentation is less demanding than a requirement

that the claimant prove which jobs he was denied, which is what the plaintiffs urge need not be shown. The record shows that while virtually every white job payed more than the highest paying jobs in black lines of work, the qualifications in each formerly white line varied, and so did the hazards associated with those tasks.[4] Thus black employees might not have sought such jobs even without the burdens of the discriminatory seniority system. Requiring a claimant to show that he was nevertheless interested and qualified for these other jobs indicates that the factors that restrained him from applying were external to the nature of such work, and creates an inference that the lack of motivation was due to the seniority system.

On the other hand, to require more of the claimants, to require, as UPIU advocates, that they point to the existence of specific vacancies in specific jobs during the relevant periods, and the reasons why the claimant did not obtain the specified jobs, is to require too much. Such information is not relevant to the question of whether the claimant would have sought or been promoted to formerly white positions had it not been for the onus created by the seniority system. Rather, these proofs are related to the question of a black employee's advancement regardless of the unlawful practice, and the burden on these proofs lies on the defendant.

Thus the Court holds that a notice and proof-of-claim statement is required of each individual claimant in this case, and such statements shall be used to determine which class members should recover backpay and what the amounts should be. The procedures for arriving at a form for these statements, the information required to be provided on them, and the procedures for determining the viability of filed claims are set forth in Part III of this Opinion, *infra*. The Court withholds judgment at this time on the necessity of adopting a class-wide rather than an individual approach to determine the specific amounts due each claimant. The hearings on backpay eligibility of disputed claimants will provide much orderly information on the number of vacancies at St. Mary's during 1965–1972, the time of the vacancies, and the number of black employees who were qualified for such vacancies when they arose.[5] Such information will greatly aid the Court in determining whether it can "flow chart" with reasonable accuracy the nondiscriminatory employment history of each eligible claimant, or whether a class-wide approach is necessary. *See U.S. Steel, supra,* 520 F.2d at 1055, 1056 (indicating individual approach should be used if feasible). Furthermore, if the Court deems a class-wide approach the most fair and expedient method, such infor-

---

**4.** Affidavit of Jeremiah A. Collins, August 17, 1981, Exhibits R, S, T, and U. Some of the tests employed for various lines of work between 1965 and 1972 were later abolished by either the 1972 Supplemental Labor Agreements between Gilman and UPIU or the Consent Decree negotiated between Gilman and the plaintiffs. Thus, this Court has never ruled on the legality of such tests under Title VII. In subsequent backpay hearings the question is almost certain to arise whether UPIU can show that a particular claimant was not qualified for a job vacancy by introducing evidence to show he would not have met the requirements imposed during that period, even though such requirements might have been illegal and even though UPIU had no hand in their maintenance. The Court withholds a ruling on this issue now and suggests that counsel for both sides brief the question prior to the first hearing.

**5.** The Proposed Order submitted by UPIU indicates that the relevant period to determine a claimant's interest in and efforts to obtain promotion is between May 4, 1968 and September 1, 1972. May 4, 1968 is the date backpay liability commences in this case under 42 U.S.C. § 2000e–5(g) (backpay does not accrue from date more than two years prior to filing charges with EEOC). However, the union was found to have discriminated against the plaintiffs from the effective date of Title VII, July 2, 1965. The view that the reconstruction period begins when backpay liability commences is rejected. *Carter v. Shop Rite Foods, Inc.,* 470 F.Supp. 1150 (N.D.Tex.1979). A reconstruction period concurrent with the duration of the unlawful practice furthers the objective of "making whole" the victims of discrimination. *Id.* at 1156. *See generally Pettway I, supra,* 494 F.2d at 252. It more accurately denotes the discriminatee's "rightful place" at the time backpay liability accrues.

mation will aid the Court in determining a proper formula. The Court, therefore, thinks it inappropriate at this time to comment on the plaintiffs' contention that backpay liability should be determined by comparing the employment status of injured blacks with "whites hired in the same year into bargaining unit jobs to which blacks, but for the jurisdictional job allocation system, could have promoted or transferred." [6]

The final issue currently before the Court is UPIU's contention that certain categories of backpay claimants submitted by the plaintiffs are not entitled to backpay because given the previous factual findings of this Court no genuine factual showing could be made that the discriminatory seniority system injured them. Specifically, these categories are:

1) twenty-one (21) backpay claimants who were not among the original classes certified by this Court (Classes A and B) to bring suit in its Order of August 30, 1974;

2) ninety-two (92) claimants hired after July 2, 1965;

3) eighteen (18) claimants hired prior to July 2, 1965 who transferred to jobs in formerly white lines of progression prior to the September 1, 1972 labor agreements that ameliorated the seniority system; and

4) eighty-three (83) claimants hired prior to July 2, 1965 who failed to transfer to formerly white jobs after the September 1972 changes in the seniority system.

**6.** Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment, March 13, 1981, p. 4.

**7.** Plaintiffs' Motion for Partial Summary Judgment, March 13, 1981. The plaintiffs, however, say that seventeen of the 258 claimants suffered no monetary loss in comparison to whites hired in the same years. UPIU argues, therefore, that backpay liability is claimed for only 241 people. But this Court expressly withholds judgment on the formula it will use to determine the exact monetary loss suffered by each actual discriminatee. Although these seventeen class members may have suffered no loss in comparison to whites

### A. The Twenty-one Nonmembers of Classes A and B.

The plaintiffs seek backpay for 258 individuals who worked at St. Mary's sometime between May 4, 1968 and August 25, 1972 in jobs that prior to June 6, 1970 were under the jurisdiction of black Local 616.[7] This figure, however, includes twenty-one individuals who were not listed among the affected classes in the Order certifying this suit as a class action, Order of August 30, 1974, or among any of the amendments that added members to those classes. UPIU, therefore, asserts that these individuals are not entitled to backpay. This Court agrees. Both trials in this action resulted in findings of union liability solely to Classes A and B, whose members were listed and certified by this Court prior to each trial. Memorandum Opinion of February 18, 1981, History of the Proceedings, p. 2.; *Myers v. Gilman Paper Co., supra,* 392 F.Supp. at 424. While it appears that these twenty-one individuals were hired at the St. Mary's plant sometime prior to April, 1973,[8] they were simply not authorized by this Court to bring suit against Gilman or the unions. Unless it can be shown that the scope of the defendant's liability encompasses a class larger than that already certified and the class is enlarged pursuant to proper motion, these individuals are not eligible to participate in backpay proceedings. It should be noted, however, that nine of the individuals in this category, Mose Butler, Jasper William Davis, Alan Foreman, Edward Green, Lester Hamilton, James Hershaw, Derry

hired in the same years, and may not be entitled to backpay under that formula, their rightful job positions at Gilman St. Mary's during the backpay liability period may be different from the jobs they actually held. Therefore, these claimants may still be entitled to backpay under another approach. The Court sees no reason why these claimants, if they meet the requirements for filing proof-of-claim forms outlined in the rest of this Opinion, *infra,* should not be allowed to show they were potential victims of the seniority system.

**8.** Plaintiffs' Submission of Backpay Evidence, April 21, 1975, p. 1.

Lee Mainor, Ronald McDougler, and Kelly Perkins were hired by Gilman after June 6, 1970,[9] the date on which the lines of progression at St. Mary's were restructured. These men could not have been injured by the seniority system. Moreover, one of the other individuals was listed on his employment card as white,[10] and the plaintiffs have presented no evidence to the contrary.

### B. Class Members Hired After Effective Date of Title VII.

■ UPIU's second contention is that the blacks who were hired at the St. Mary's plant after July 2, 1965, the effective date of Title VII, are ineligible for backpay. UPIU argues that even if the seniority system was maintained after 1965 with the intent to "freeze" blacks into unappealing jobs, it was only an intent to *continue* the effects of pre-1965 discrimination in assignment, and did not result in new discrimination against black employees joining Gilman after 1965. UPIU reasons that the intention to "freeze" certain people into less appealing jobs can only be realized if those people are intentionally placed in such positions. Since Gilman Paper ceased its discriminatory assignments policy regarding blacks in 1965, assigning some blacks to formerly all white lines of work and others to less appealing, formerly all black lines, those blacks "frozen" into the latter jobs cannot complain that they were "frozen" because of race; rather, if they were "frozen," it was on a neutral basis. Further, they infer that the *Teamsters* Court held that a prerequisite for finding that the operation of a seniority system discriminated against workers under § 703(h) of Title VII is a finding that those workers were hired or assigned on a discriminatory basis. *See Younger v. Glamorgan Pipe and Foundry Co.*, 561 F.2d 563, 565 (4th Cir. 1977) (*per curiam*) (*Teamsters* "appears to require" finding of discrimination in hiring to hold seniority system invalid).

The Court does not agree with this analysis. The problem is one of semantics. The seniority system at Gilman St. Mary's was more than just a rule that a line transferee forfeits his previous seniority for promotion in his new line of work. That seniority system included the plant structure in which those rules operated—in other words, the promotion system. The promotion system at the Gilman St. Mary's plant was organized on a line of progression basis. But more importantly, those lines were found to be drawn in an artificial, inefficient manner, with the purpose of segregating and discriminating against black workers. While a machine at the plant may have required six tasks, and white workers could progress from the most menial to the most skillful of the six, the line of progression on that same machine for black workers may only have been the first two more menial tasks. Memorandum Opinion of February 18, 1981, Findings of Fact ¶¶ 13, 14, and 15. Some tasks, given only to blacks, were deemed a line of progression in themselves. Thus the black worker had to transfer more frequently and with greater risk than his white counterpart in order to advance. And most important, this artificial promotion system was *not* abandoned after 1965. If a black worker was lucky enough to land a job in a formerly white line of work he could progress "naturally;"[11] but most of the blacks hired between

---

9. Affidavit of Jeremiah A. Collins, August 17, 1981, ¶ 3.

10. Affidavit of Jeremiah A. Collins, August 17, 1981, ¶ 3.

11. It is interesting to note that after July 2, 1965, although blacks qualified for formerly white lines of progression, whites were almost never placed in black lines of progression. Therefore UPIU's argument that discrimination in assignment ceased after 1965 is suspect. Indeed, this Court never specifically ruled on that issue. It is, of course, open to further semantical debate whether the clarification today is really a pronouncement that there was post-Act discrimination in hiring at St. Mary's after 1966. To be sure, assignment and promotion are inextricably linked processes. They are, however, separate processes, and it was the promotion process that harmed post-1965 black hirees, and which the union agreed to and supported in their collective bargaining agreements. Therefore the Court considers itself to be on solid ground in clarifying its February 18, 1981 decision to explain the broader

---

1965 and 1970 [12] were placed in the same artificial lines of promotion as their pre-1965 predecessors. *Myers v. Gilman Paper Co.*, 544 F.2d 837, 844 (5th Cir.), *vacated and remanded*, 556 F.2d 758 (5th Cir. 1977). Once hired, these blacks faced a more difficult path to advancement than whites, and this was not due to their initial assignment, but because the promotion system at Gilman St. Mary's was set up and maintained, with the consent of the unions, to make it more difficult for blacks to be promoted than whites. Therefore every black hired after 1965 and placed in the artificial black lines of progression is entitled to show he sought or was interested in jobs in other lines and was qualified for those jobs.

When the seniority system is looked at in this light, with the focus on the whole system of promotion, the inference of *Teamsters* is easily reconciled. In *Teamsters* the seniority rules and the job jurisdiction plan in which they operated were distinct entities. It was possible to be free of discrimination in promotion but nevertheless discriminated against by the mechanics of the seniority rules. The *Teamsters* Court reviewed the seniority system with the sole purpose of determining if blacks and hispanics, not injured by post-Act discrimination in "hiring, assignment, transfer or promotion processes," were nevertheless entitled to seniority relief. *Id.* 431 U.S. at 348, 97 S.Ct. at 1861. In that context, it was indispensible that there be pre-Act discrimination and that discrimination be in the initial hiring. But in the instant case the promotion system and the seniority system are so intertwined that a reliable assessment of the average worker's progress at St. Mary's cannot be made without viewing these processes as one. [13] And that larger process was found to be a post-Act discriminatory practice because it erected stumbling blocks to promotions solely on racial grounds. The necessity of discriminatory hiring is incidental to finding liability and should not weed out those black workers at St. Mary's who may have desired and deserved jobs better than they received.

### C. Class Members Who Transferred Prior to 1972.

■ UPIU next contends that any class member who transferred to a job in a non-616 line of progression during the operation of the unlawful seniority system cannot claim backpay because the system did not deter him from advancement. Eighteen people are alleged to come under this category. [14]

While a claimant's transfer during the operation of the unlawful seniority system indicates he was able to overcome the stumbling blocks to advancement that system created, it does not *per se* indicate that those claimants reached their "rightful places" of employment at the date upon which backpay liability accrues. Had there been no stumbling blocks to advancement at St. Mary's these claimants might not have had to transfer to new lines of progression and could have advanced further in the lines of progression they ultimately reached. Thus, their "rightful place" during which liability accrues might be in higher-paying jobs. A claimant's transfer in the face of the seniority system reduces the gap between his rightful place and a job in a black line of progression. It does not

holding of complicity by the unions in a discriminatory seniority promotion system.

12. The lines of progression were reformulated along rational, more business-related lines pursuant to labor agreements between Gilman & UPIU effective June 6, 1970.

13. This is not to say that when the lines of progression were restructured along nonartificial lines, the seniority system at Gilman St. Mary's was no longer discriminatory. The seniority system rules still discouraged line transfer—a line transferee had to sacrifice all seniority and face the risk of layoff. Since the black workers in jobs formerly under Local 616 were still stuck in the less attractive albeit now more rationally constructed lines, the seniority rules had the most burdensome effect on these employees. And the rules were maintained until September 1972 with the intent to discourage transfer, and thus advancement, by these blacks.

14. Affidavit of Jeremiah A. Collins, August 17, 1981, ¶ 4.

preclude a showing that the advancement would have been greater absent the line of progression seniority system. These eighteen claimants should be allowed to make such a showing, so summary judgment against them is denied.

### D. Class Members Who Failed to Transfer to a Non-616 Job Between September 1972 and December 1974.

■ UPIU's final contention is that those class members who failed to transfer out of 616 lines of work once the seniority system was reformed indicates, as a matter of law, that their failure to transfer under the unlawful seniority system was due to lack of interest and not its discriminatory features. Eighty-three people are said to fall within this category.[15]

While this Court thinks that a claimant's failure to transfer under the reformed system strongly indicates that claimant was unharmed by the pernicious effects of the system, it cannot say as a matter of law that any post-1972 (the year the system was reformed) non-transferee was not injured. A claimant's motives for not transferring in 1973 may not ever have arisen in 1965. Reluctance to begin new work at a more advanced age or to transfer from a well-entrenched routine may have been decisive in 1973 but absent in 1965. These claimants could show they desired non-616 jobs during the years of unlawful discrimination and were qualified for them in spite of their unwillingness to transfer once the system was reformed. Motivations change and one fact does not preclude a finding of the other.

*Younger v. Glamorgan Pipe and Foundry Co.*, 418 F.Supp. 743 (W.D.Va.1976), *rev'd per curiam on other grounds*, 561 F.2d 563 (4th Cir. 1977), which UPIU relies on for support, does not contradict this view. In *Glamorgan* the Court held that the failure of claimants to transfer out of their departments once the deterrents to transfer (restrictive bidding practices) were removed rendered them ineligible for backpay. But this ruling was made *following* backpay

hearings in which the claimants failed to present evidence to show that the unlawful practices had a deterrent effect. This failure rendered it impossible for the court "to establish, except by conjecture or speculation, any connection between the claimed injuries and the ... practices employed." *Id.* at 768. Thus *Glamorgan* is not read as holding that non-transferees under a reformed seniority system are precluded from showing that they would have sought a transfer years before when the system remained discriminatory.

### III. *Procedure With Respect To Backpay Proceedings*

Consistent with the discussion above and for the purpose of expediting backpay proceedings the Court HEREBY ORDERS the following procedures:

1. A notice and proof-of-claim form shall be sent by the Clerk of the Court to the individuals for whom plaintiffs have claimed backpay, as identified in the Appendix to Plaintiffs' Motion for Partial Summary Judgment, filed March 13, 1981 excluding (i) those individuals who are not listed among Classes A and B pursuant to this Court's Order of August 30, 1974, and any approved Amendments to that Order, and (ii) those claimants who were hired by Gilman after June 6, 1970, when the lines of progression began operating under a nondiscriminatory structure.

2. Counsel for the parties shall endeavor to reach agreement on the form of the notice and the proof-of-claim form. Within twenty (20) days of the issuance of this Order, the parties shall submit a joint proposal to the Court in that regard, or, in the absence of agreement, the parties shall submit their respective proposals.

3. The proof-of-claim form shall require each individual seeking backpay to submit at least the following information, under penalty of perjury:

a) His name and social security number;

---

15. Affidavit of Jeremiah A. Collins, August 17, 1981, ¶ ¶ 6, 7.

b) An identification of any jobs, other than jobs that were formerly within the jurisdiction of UPIU Local 616, which the claimant desired to obtain between July 2, 1965 and September 1, 1972, but did not obtain;

c) A statement as to whether the claimant either made any efforts with management or his local union to obtain any of the jobs, expressed his desire to obtain such jobs to third parties, or held firm but unexpressed personal feelings about obtaining such jobs, and if so, when and with what result; and

d) A description of the claimant's qualifications for the desired jobs.

4. In order to be eligible for a possible award of backpay, an individual will be required to file a proof-of-claim form with the Clerk of the Court within forty (40) days of the date of the notice. The Clerk shall make copies of all forms received available to counsel for the parties. Within thirty (30) days of the filing of the forms, plaintiffs' counsel will file with the Court a statement of plaintiffs' position with respect to each claim, and defendant's counsel will file with the Court defendant's responsive statement to each claim.

5. If any claims are contested, the Court will conduct an evidentiary hearing to determine, with respect to each claimant, (i) whether the claimant desired to obtain a non-616 job during the period from July 2, 1965 to September 1, 1972, and if so, which job(s) he desired to obtain; (ii) whether Gilman should have granted the claimant a transfer to the specified job(s) if the claimant had sought to transfer. If each of these questions is answered in the affirmative, a claimant will be fully eligible for an award of backpay.

IV. *Conclusion*

In conclusion, this Court holds that each claimant is required to file a proof-of-claim form indicating the positions he sought or would have sought had the seniority system been nondiscriminatory and his general qualifications for those positions. Hearings will then be held to allow the defendant to prove that these claimants were not actually injured by the stumbling blocks of the seniority system. As long as a class member was employed sometime after 1965 in a job line under the jurisdiction of black Local 616, or a job line that was artificially maintained to segregate blacks, that class member is entitled to file a proof-of-claim form. However, only members of Classes A and B filed and certified by this Court pursuant to its Order of August 30, 1974 may file the proof-of-claim form.

Finally, the Court reminds counsel that the complexities of this case and the consequential jagged path it has already taken commend resolution "by means more efficient, economical and expeditious" than a continuation of the litigation, and welcomes the submission of any settlement proposals the parties may tender. *Ingram v. Madison Square Garden Center, Inc., supra,* 482 F.Supp. at 922 n.5.